UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

LAVON PARKS and
JAMES C. PARKS,

Defendants.

---

**REPORT AND RECOMMENDATION**

19-CR-00087(LJV)(JJM)

Defendants Lavon and James C. Parks are charged in a Superseding Indictment with various controlled substance and firearms offenses. [137].[1] Before the court are motions by James Parks [109, 202] and Lavon Parks [203] to suppress evidence obtained on the morning of November 30, 2017 in Hickman County, Tennessee, when a Kia automobile operated by James Parks was stopped by Agent Brent Spivy of Tennessee's 21st Judicial District Drug Task Force.[2]

The motions have been referred to me by District Judge Lawrence J. Vilardo for initial consideration [10]. An evidentiary hearing was held before me on September 29 and December 3, 2020 [304, 332] at which Agent Spivy testified on behalf of the government. Having reviewed the parties' post-hearing submissions [334, 335, 336, 337, 342, 343, 346, 347]

---

1 Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination (upper right corner of the page).

2 I previously addressed defendants' motions to dismiss and to join the Superseding Indictment in 19-CR-87 with the Indictment in 20-CR-69. *See* May 1, 2020 Report, Recommendation and Order [252]; July 15, 2020 Report, Recommendation and Order (19-CR-87 [292]; 20-CR-69 [21]). Defendants have indicated that no other issues raised in their pretrial motions remain in dispute. *See* May 1, 2020 Report, Recommendation and Order [252], p. 1 n.3; Donohue Affirmation [347], ¶5.

and heard oral argument on February 12, 2021, for the following reasons I recommend that the motions be denied.

## FACTS

Agent Spivy testified that on the morning of November 30, 2017 he was stationed on the eastbound lane of Interstate 40 in Hickman County, Tennessee when he received a radio message indicating that his colleague, Sgt. Jeff Fuller, stated that "there was a blue Kia that was coming, had a Virginia tag on it . . . that there were no violations on it and he just wanted to call ahead and . . . see what you think." [304] at 12, 18, 19. The message did not indicate the basis for Fuller's suspicion, and he did not speak to Fuller. Id. at 18. Shortly thereafter, he observed a blue Kia automobile heading eastbound in the right hand lane. Id. at 19. He saw that it had a Virginia license plate, and measured its speed as 59 m.p.h. in a 70 m.p.h. zone. [304] at 21.

Agent Spivy's dashcam and bodycam videos (govt. ex. 1A, 1E [328-1])[3] depict the following events. As he approached the Kia from behind, its left wheels slightly crossed the center line of the highway on a few occasions. Both he and the Kia then passed a stationary vehicle on the right hand shoulder of the highway, which was displaying its emergency flashers. As it passed that vehicle, the Kia did not reduce its speed, nor did Agent Spivy. At that point Agent Spivy activated his emergency flashers and pulled the Kia over.

He ordered the driver (defendant James Parks) to get out of the car. He explained that he had pulled him over for traffic law violations [328-5] and asked where he was coming from and where he was heading. Parks responded that they had gone to Pensacola Florida, then changed it to Panama Beach, and that they were heading home to Niagara Falls. Agent Spivy

[3] The CVD containing the dashcam and bodycam videos, all of which are in evidence, will be forwarded to District Judge Vilardo for his review.

testified that he understood Panama Beach "to be Panama City . . . . And based upon the fact that we were on I-40 coming from the Memphis area . . . the direction of travel was coming from Memphis going towards Nashville rather than going straight north from Panama City to New York, that caused for quite a bit of suspicion for me because . . . they were a couple of hours outside of their - or off of their route." [304] at 36-37.

Parks told him that the Kia was a rental vehicle, and that the rental agreement was in the car. Agent Spivy then went to the car to question the passengers (Wayne Payne and Lavon Parks) and retrieve the rental agreement, stating that he "wanted to speak with the other passengers given my suspicion based upon him coming from Florida going to New York and he is in - coming out of west Tennessee", although he "did not require anything from them in order to write the traffic tickets". [304] at 158. He explained the traffic violations to them and asked where they were coming from. They responded that they were coming from Houston, where they had spent a few days. "So based on the fact that I had gotten the conflicting stories . . . then I did become suspicious that there was possibly criminal activity and I suspected that it was drugs." [332] at 53. He then returned to James Parks, patted him down for weapons, and placed him in his police vehicle, at which point he made a radio call for a warrant check on the three occupants of the Kia.

While awaiting the results of the warrant check, he engaged James Parks in further conversation. When he asked Parks about coming from Panama City, Parks changed his story and said he had travelled from Florida to Houston to pick up his son, Lavon Parks. He asked Parks whether there were any guns, knives, large amounts of currency, heroin, cocaine or marijuana in the vehicle, and Parks said no. He then asked Parks if he could search the vehicle, and Parks agreed. He told Parks he would prepare a consent form for him to review and sign,

and asked him to step out of the police vehicle while he prepared the form. He then asked Parks to read the form [328-2] aloud, and asked him whether he had any questions. Parks initially replied that he did have a question, but then said he would sign the form, and did so. The ensuing search of the Kia revealed the presence of cocaine, crack cocaine and packing material [328-4], and the occupants were placed under arrest.

In moving to suppress, defendants argue that the traffic stop was unjustified, that the duration of that stop was excessive, and that James Parks' consent to search the vehicle was unlawfully obtained.

## DISCUSSION

### A. Was the Traffic Stop Initially Justified?

While Agent Spivy admitted that "criminal activity is what we were seeking out" ([304] at 110), "an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance". United States v. Dhinsa, 171 F.3d 721, 724-25 (2d Cir. 1999). Therefore, if he "has observed a traffic violation, his actual motivation for stopping the vehicle is irrelevant to whether the stop is constitutionally reasonable". United States v. Foreste, 780 F.3d 518, 523 (2d Cir. 2015).

James Parks was charged with violating Tennessee Code §§55-8-123(1) and 55-8-132(h). [328-5]. Section 55-8-123(1) provides that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic . . . A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety". "[C]rossing over a fog line with two of a car's four wheels is an instance of leaving one's lane of travel", State v. Smith, 484

S.W.3d 393, 404, 408 (Tenn. 2016), and the statute "is violated when a motorist strays outside of her lane of travel when *either* (1) it is practicable for her to remain in her lane of travel *or* (2) she fails to first ascertain that the maneuver can be made with safety." Id. at 408 (emphasis in original). Since the dashcam video (govt. ex. 1A) clearly shows the Kia vehicle touching and slightly crossing the center line of the highway, Agent Spivy could properly believe that this section had been violated whether or not any other driver was endangered.

Section 55-8-132(h) provides that "[u]pon approaching a stationary motor vehicle that is located on the shoulder, emergency lane, or median and the vehicle is giving a signal by use of flashing lights, a person who drives an approaching vehicle shall: (1) Proceeding with due caution, yield the right-of-way by making a lane change into a lane not adjacent to that of the motor vehicle, if possible with due regard to safety and traffic conditions, if on a highway having at least four (4) lanes with not less than two (2) lanes proceeding in the same direction as the approaching vehicle; or (2) Proceeding with due caution, reduce the speed of the vehicle, maintaining a safe speed for road conditions, if changing lanes would be impossible or unsafe."

The dashcam video shows that both the Kia vehicle and Agent Spivy remained in the right hand lane of the highway and failed to reduce their speed as they passed a vehicle on the side of the highway whose lights were flashing. Although they may have been maintaining a safe speed for road conditions, the statute also required them to reduce their speed, which both failed to do.

The fact that Agent Spivy likewise appears to have violated the statute[4] does not exonerate James Parks, as two wrongs do not make a right. Therefore, even if the initial traffic

---

[4] *See* Bonds v. Emerson, 94 S.W.3d 491, 494 (Tenn. 2002) ("[i]n order for [the] police vehicle to be exempt from the rules required of other vehicles using the highway, the vehicle must have in operation both audible and visual signals, and if the emergency vehicle rule does not apply, [it] was subject to the rules of the road and common law duties of the ordinary motorist").

stop was pretextual, it was justified. *See* United States v. Dunnigan, 2018 WL 3196953, *1 (W.D.N.Y. 2018) ("even in the case of a 'pretext' stop, the only question under the Fourth Amendment is whether the officer had probable cause or reasonable suspicion to initiate the traffic stop").

**B. Was the Duration of the Stop Excessive?**

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." Rodriguez v. United States, 575 U.S. 348, 350-51 (2015). "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop . . . . Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355. "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 354-55.

Agent Spivy's initial questioning of James Parks and the passengers was not improper. "A traffic stop is not measurably extended by extraneous questioning even when such questioning undeniably prolongs the stop to a minimal degree . . . . [Q]uestions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer do not bespeak of a lack of diligence." United States v. Stepp, 680 F.3d 651, 662 (6th Cir. 2012); Dunnigan, *3.

"Reasonable suspicion is based on the totality of circumstances. The level of suspicion necessary to meet the standard is considerably less than proof of wrongdoing by a preponderance of the evidence . . . . Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." United States v. Green, 2017 WL 9730254, *5 (W.D.N.Y. 2017), adopted, 2018 WL 1136928 (W.D.N.Y. 2018). "An indication of possible illicit activity is properly informed by commonsense judgments and inferences about human behavior", Dancy v. McGinley, 843 F.3d 93, 106 (2d Cir. 2016), viewed "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training". Id. "Whether . . . reasonable suspicion exists is an objective inquiry; the actual motivations of the individual officers involved in the stop play no role in the analysis." Holeman v. City of New London, 425 F.3d 184, 190 (2d Cir. 2005).

In this case, several factors would create reasonable suspicion in the mind of a reasonable and cautious police officer. "Bizarre travel plans may, by themselves, contribute to reasonable suspicion that criminal rather than innocent activity is under way." United States v. Ludwig, 641 F.3d 1243, 1249 (10th Cir. 2011); Green, 2017 WL 9730254, *6 ("inconsistent answers about travel plans"); United States v. Hill, 195 F.3d 258, 272 (6th Cir. 1999) ("[d]efendants' inconsistent stories regarding their travel itinerary . . . contributed to Deputy Whitlock's suspicion that Defendants were engaged in criminal activity"); United States v. Berry, 664 Fed. App'x 413, 419 (5th Cir. 2016) ("inconsistent and untruthful statements can be a factor in developing reasonable suspicion during a traffic stop"); United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (defendant "gave conflicting responses as to where he had been").

In addition to the contradictory travel history given by defendants, the Kia vehicle was nine days overdue. *See* rental agreement [328-3], listing a return date of November 21, 2017;

United States v. Fadiga, 858 F.3d 1061, 1063 (7th Cir. 2017) ("[t]he return date on the rental contract had passed"). Although Agent Spivy did not mention this factor, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action". Whren v. United States, 517 U.S. 806, 813 (1996).

Under these circumstances, Agent Spivy was justified in questioning James Parks further while awaiting the results of the warrant check. "Checking driver's licenses and determining whether there are outstanding warrants are part of a routine traffic stop . . . . Because [the officer] inquired about illegal drugs while waiting for dispatch to run the driver's licenses, that inquiry did not prolong the stop." Green, 2018 WL 1136928, *9; United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006) ("neither our prior cases nor any other caselaw institutes a per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions").

"When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted." Green, *9. Therefore, the final issue for my consideration is whether James Parks' consent to search the vehicle was properly obtained.

**C. Did James Parks Voluntarily Consent to the Search of the Vehicle?**

A consent to search "is deemed to make the search 'reasonable' for purposes of the Fourth Amendment. For such a consent to be valid, however, it must be voluntarily and

freely given. It may not be the product of duress or coercion, flagrant or subtle." United States v. Sanchez, 635 F.2d 47, 58 (2d Cir. 1980).

"The burden of proving that the consent was voluntarily given lies on the prosecution . . . . In determining whether this burden has been carried, no one factor is controlling. Rather, the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. Id. "Relevant considerations include, but are not limited to, the age of the subject, his level of education and of intelligence, and whether he was deprived of food or sleep or subjected to other physical abuse. When the claimed consent has been given by a person in custody it is appropriate to be particularly sensitive to the heightened possibilities for coercion . . . but the fact of custody alone does not mean that a consent to search was coerced." Id. "Where there is no indication that the subject was unable in the face of a custodial arrest to exercise a free choice, a valid consent may be given." Id.

While James Parks may not have felt that he was free to leave under the circumstances, "[t]he free-to-leave inquiry . . . [is] not determinative . . . in establishing Miranda custody". Dunnigan, *4. "Instead, the ultimate inquiry . . . is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id. The circumstances were not equivalent to an arrest: James Parks was not handcuffed and no threats were made. The consent form [328-2], which he read aloud before signing, stated: "I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form".

"The ultimate question presented is whether the officer has a reasonable basis for believing that there had been consent to the search." United States v. Lawson, 961 F. Supp. 2d

496, 500 (W.D.N.Y. 2013). Under the circumstances, I conclude that Agent Spivy had a reasonble basis to believe that James Parks had consented to the search of the vehicle, and since "none of the occupants of the car suggested in any manner that [he] lacked authority to consent to a search", it "was reasonable . . . to believe that [he] had such authority". United States v. Ojudun, 915 F.3d 875, 884 (2d Cir. 2019).

**CONCLUSION**

For these reasons, I recommend that defendants' motions to suppress [109, 202, 203] be denied. Unless otherwise ordered by District Judge Vilardo, any objections to this Report and Recommendation must be filed with the clerk of this court by April 2, 2021. Any requests for extension of this deadline must be made to District Judge Vilardo. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not

raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: March 19, 2021

/s/Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge