UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    v.

LAVON PARKS and
JAMES C. PARKS,

        Defendants.

19-CR-87-LJV-JJM
20-CR-69-LJV-JJM
DECISION & ORDER

---

On May 2, 2019, the defendants, Lavon Parks ("Lavon") and James C. Parks

("James"), were indicted for various drug offenses.  Docket Item 1.[1]  On May 7, 2019,

the case was referred to United States Magistrate Judge Jeremiah J. McCarthy for all

proceedings under 28 U.S.C. § 636(b)(1)(A) and (B).  Docket Item 10.  On October 24,

2019, a grand jury charged Lavon and James in a superseding indictment, which

added, among other things, a charge for discharge of a firearm causing death.  Docket

Item 137.[2]

Before the Court are:

- a Report, Recommendation, and Order ("RR&O"), dated May 1, 2020, Docket

  Item 252, which:

  - recommended granting the defendants' motions to dismiss count 3 of

    the superseding indictment for improper venue, Docket Items 202 and

    203;

---

[1]  Unless otherwise noted, docket citations are to Case No. 19-cr-87.

[2]  On April 13, 2022, a grand jury charged Lavon and James in a second
superseding indictment, Docket Item 546, but they have not yet been arraigned on
those charges.

- o denied the defendants' motions for bills of particulars, Docket Items 202 and 204;

- o recommended denying Lavon's motion for a pretrial hearing under *Wade v. United States*, 388 U.S. 218 (1967), Docket Item 203;

- o recommended granting the government's motion to strike Lavon's second pretrial motion, Docket Item 235, or alternatively, denying Lavon's motion, Docket Item 229;

- o denied James's motion for production of grand jury minutes, Docket Item 202, as moot in light of the recommendation to dismiss count 3; and

- o granted the government's cross-motion for reciprocal discovery, Docket Item 234 at 36-37;

- an RR&O, dated July 15, 2020, Docket Item 292, which:

  - o granted the government's motions to join the superseding indictment in Case No. 19-cr-87 with the indictment in Case No. 20-cr-69 ("2020 indictment"), Docket Items 280-83, 285; and

  - o recommended denying the defendants' motions to dismiss the 2020 indictment on venue grounds, Case No. 20-cr-69, Docket Items 10 and 12; and

- a Report and Recommendation ("R&R"), dated March 19, 2021, Docket Item 352, which recommended denying the defendants' motions to suppress, Docket Items 109, 202, and 203.

2

On April 29, 2021, James objected to the RR&Os and the R&R.  Docket Item 362.[3]  More specifically, James argued that (1) the joinder of the charges in Case No. 20-cr-69 and the refusal to dismiss the indictment in that case were error; and (2) the evidence obtained during a traffic stop on November 30, 2017, in Tennessee should be suppressed.  *Id.*  On May 1, 2021, Lavon objected to the RR&Os and the R&R on those same grounds; he also argued that the R&R should have required the government to provide a bill of particulars specifying when Lavon allegedly joined and exited the conspiracy.  Docket Item 364.  Lavon's counsel also submitted additional objections that Lavon had written himself.  Docket Item 364-1.

On May 13, 2021, the government moved to strike Lavon's *pro se* objections.  Docket Item 367.  On May 14, 2021, the government responded to the defendants' objections.  Docket Items 368 and 369.  On June 22, 2021, Lavon filed a supplemental memorandum of law in support of his objections and requesting that the suppression hearing be reopened.  Docket Item 379.  On July 13, 2021, the government responded to Lavon's supplemental brief.  Docket Item 392.  On July 17, 2021, James replied, Docket Item 396, and on July 20, 2021, Lavon replied, Docket Item 397.

On September 22, 2021, this Court granted Lavon's request to reopen the suppression hearing.  Docket Item 408.  The Court held the reopened hearing on February 4, 2022, and March 10, 2022.  Docket Items 490 and 530.  On March 19, 2022, the defendants filed a joint post-hearing memorandum.  Docket Item 533.  The

---

[3]  The defendants consolidated their objections on the May 2020 RR&R and the March 2021 R&R.

government responded on April 1, 2022, Docket Item 543, and the defendants replied on April 7, 2022, Docket Item 545.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).  The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

This Court has carefully and thoroughly reviewed the RR&Os and R&R; the objections, responses, and replies; the transcripts of the suppression hearings; the supplemental submissions; and the materials submitted to Judge McCarthy.  Based on that *de novo* review, this Court adopts those parts of Judge McCarthy's recommendations to which there were no objections.  This Court also accepts and adopts Judge McCarthy's order denying Lavon's motion for a bill of particulars.  The Court respectfully declines to accept the March 2021 R&R, Docket Item 352, however, and grants the defendants' motions to suppress.[4]

---

[4]  In light of its decision on the motions to suppress, this Court will hold a status conference on the defendants' motions to dismiss the indictment in Case No. 20-cr-69, and the government's motion for joinder; if necessary, the Court will issue a decision on those motions on a later date.

## DISCUSSION

I.      **MOTIONS TO SUPPRESS**

   **A. Relevant Factual Background[5]**

On the morning of November 30, 2017, Agent Brent Spivy was working as a member of the interdiction unit of the State of Tennessee's 21st Judicial Drug Task Force.  Docket Item 304 at 106.  As a member of that unit, his job was to "[o]bserve traffic violations, conducting [sic] an interview and an investigation and if it ended up coming into drugs or narcotics, that was . . . a goal."  *Id.* at 110.  "[U]ltimately[,] criminal activity [was] what [the members of the interdiction unit] were seeking out."  *Id.*

Spivy was stationed on the eastbound lane of Interstate 40 in Hickman County, Tennessee, when he received a radio message from his colleague, Sergeant Jeff Fuller, about "a Kia SUV [with] Virginia tags that was traveling eastbound towards where [Spivy was] sitting."  *Id.* at 12, 17-19.  The message relayed that Fuller had "found [the Kia SUV] to be suspicious[,] . . . but there were no traffic violations," and Fuller therefore had no basis "to conduct a traffic stop and investigate his suspicion."  *Id.* at 17.

A short time later, Spivy observed a blue Kia SUV with a Virginia license plate heading eastbound in the right-hand lane.  *Id.* at 19-21.  His "intent was to . . . observe the vehicle to see if it provided a reason, a violation of Tennessee statute in order to conduct an investigation."  *Id.* at 109.

---

[5] Judge McCarthy made factual findings from the hearings held on September 29, 2020, *see* Docket Item 304, and December 3, 2020, *see* Docket Item 325.  Based upon this Court's *de novo* review, the testimony and exhibits admitted during the hearings support those findings.  The Court incorporates by reference those factual findings into this Decision and Order, supplements those findings with testimony and exhibits as noted, and summarizes the facts relevant to the defendants' objections.

Spivy noticed that the Kia was moving more slowly than most traffic, and he measured its speed as 59 miles per hour in a 70 miles-per-hour zone.  *Id.* at 21.  He then "pulled from [his] position in the median and began traveling eastbound in an attempt to catch up to the vehicle to observe it further."  *Id.* at 25.  As Spivy followed the Kia from behind, its left wheels slightly crossed the center line of the highway twice.  *Id.* at 27-28.  Spivy testified that this constituted a traffic violation under Tennessee law.  *Id.* at 28.  The Kia then passed a stationary vehicle, which was displaying its emergency flashers, on the right-hand shoulder of the highway.  *Id.* at 29-30.  As it passed that vehicle, the Kia did not reduce its speed, which Spivy testified was a second traffic violation.  *Id.* at 29.  The two violations gave Spivy what he needed to stop the car, so he activated his emergency flashers and pulled the Kia over.  *Id.* at 30-31.

Rather than walking up to the driver's window, Spivy ordered the driver, James, to get out of the car.  *Id.* at 146.  He asked James for his driver's license, and James produced it promptly.  *Id.* at 148.  Spivy quickly ruled out intoxication.  *Id.* at 146.

Spivy explained to James that he had pulled him over for two reasons.  Gov. Ex. 1E at 0:01-0:20.  First, Spivy explained, the driver's-side tires of the car had crossed over the center line twice.  *Id.* at 0:20-0:30.  James responded that he had been playing with his GPS.  *Id.* at 0:30-0:35.  Spivy laughed and said, "oh man, come on now! . . . I hear ya . . . I gotcha."  *Id.*  Spivy then said that James had failed to slow down when he passed a disabled vehicle on the side of the road in violation of Tennessee's move-over law.  *Id*. at 0:35-0:45.  James responded that he thought that law applied only to moving vehicles.  *Id.* at 0:45-0:50.  Spivy responded, "I gotcha.  Yeah . . . that's the reason why."  *Id.* at 0:50-0:55.

Spivy then had the following two-minute exchange with Parks:

SPIVY:  So where are you all heading?

JAMES:  We heading home.

SPIVY:  Heading home?  Where's home for you?

JAMES:  New York.

SPIVY:  New York?

JAMES:  Yeah.

SPIVY:  Yeah, I gotcha.  Where you coming from?

JAMES:  We went to Pensacola Florida.

SPIVY:  You went to Pensacola?

JAMES:  No, what is it, Panama Beach.

SPIVY:  You went to Panama Beach?

JAMES:  Yeah.

SPIVY:  Ok.  So where are you coming from right now?

JAMES:  Just Panama Beach, we're coming back up this way.

SPIVY:  Ok.  How long were you in Panama?

JAMES:  Umm, a couple of days for the holidays.

SPIVY:  Oh yeah?

JAMES:  Yeah.

SPIVY:  You go see anybody while you were there?

JAMES:  No, we just went to the beach, and then we went to a conference.

SPIVY:  A conference?

JAMES:  Yeah.

SPIVY:  What kind of conference?

JAMES:  Umm Deana Dixon.

SPIVY:  What now?

JAMES:  Deanna Dixon, a prophetic conference.

SPIVY:  Ok.  Ok.  So where'd you stay when you all were down there?

JAMES:  At a hotel.  Umm . . . what was it?  On . . . beachfront?  Where all the hotels is . . . beachfront.

SPIVY:  Do you remember the name of it?

JAMES:  Ah, man.  I don't remember the name of it.

SPIVY:  So what day did you check out?

JAMES:  I checked out on the 27th or 28th.

SPIVY:  Ok.  Do you know what day it is today?

JAMES:  Today is Thursday.

SPIVY:  Right.  Do you know what the date is?

JAMES:  Today is the 29th.

SPIVY:  Today is the 30th.

JAMES:  Today is the 30th?

SPIVY:  Yes, it is.

JAMES:  Oh, ok.

SPIVY:  Alright, so, who do you have in the car with you?

JAMES:  I got my son, Lavon, and I got ummm . . . Sonny.

SPIVY:  Sonny?

JAMES:  Yeah.

SPIVY:  Sonny what?

JAMES:  Sonny Payne.

SPIVY:  I gotcha.  So how do you know them?  Your son, and who is the other guy?

JAMES:  Yeah, Sonny, Sonny, he's a homeless vet.

SPIVY:  He's a homeless vet?

JAMES:  Yeah.

SPIVY:  I got you.  Alright.  So you said you were all going home.  Where is home for you?

JAMES:  I told you.  Niagara Falls, New York.

SPIVY:  Alright.  Do me a favor if you would, stand right here. I'm going to get some information from them.  Is this your car?

JAMES:  It's a rental.  You want me to get the paperwork?

SPIVY:  I'll grab it.  Just stand back there for me.

Gov. Ex. 1E at 0:55-2:55.

At the suppression hearing, Spivy testified that he understood Panama Beach "to be Panama City . . . . And based upon the fact that we were on I-40 coming from . . . the Memphis area . . . the direction of travel was coming from Memphis going towards Nashville rather than going straight north from Panama City to New York, that caused for quite a bit of suspicion for [him] because . . . they were a couple of hours outside of their - or off of their route."  Docket Item 304 at 36-37.[6]  So he "began asking questions

---

[6]  It appears that Spivy may have thought that the defendants were heading to New York City, instead of Niagara Falls, as Tennessee is on the way from the Florida panhandle to Western New York; in fact, the fastest routes pass through or near Nashville.  *See* Driving Directions from Panama City, FL, to Niagara Falls, NY, GOOGLE MAPS, https://maps.google.com (follow "Directions" hyperlink; then search starting point

about . . . the duration of the trip, how long . . . they were there, when they checked out, just trying to establish a timeline" to "see if there was any legitimacy to that story." *Id.* at 42.  Spivy admitted, however, that "[t]he travel itinerary and the date [James] left from wherever he left" did not "have anything to do with the traffic tickets [Spivy was] going to issue." *Id.* at 157.

Spivy then walked over to the car and spoke with the passengers.  He explained the two traffic violations to them, and he asked where they were coming from.  They responded that they were coming from Houston, where they had spent a few days. Gov. Ex. 1E at 2:55-4:15.

Spviy testified that he "wanted to speak with the other passengers given [his] suspicion based upon [James's] coming from Florida going to New York and he is in -- coming out of west Tennessee."  Docket Item 304 at 158.  He admitted, however, that he "did not require anything from them in order to write the traffic tickets." *Id.*  He also admitted that he did not have any "suspicion of specific criminal activity" when he spoke to the passengers. *Id.* at 157-59.  But Spivy said that after speaking with the passengers, "based on the fact that [he] had gotten the conflicting stories[,] . . . [he] then did become suspicious that there was possibly criminal activity and [he] suspected that it was drugs." *Id.* at 53.

Spivy then returned to James, patted him down for weapons, and instructed him to sit in the police vehicle. *Id.* at 62.  Spivy made a radio call for a warrant check on the three occupants of the Kia. *Id.* at 47.  He admitted that it was not his "usual practice to

---

field for "Panama City, FL" and search destination field for "Niagara Falls, NY").  So the defendants were off-route, but perhaps not by as far as Spivy believed.

run warrant or detainer checks on all occupants of a vehicle when [he] perform[s] a routine traffic stop." *Id.* at 166-67.

While waiting for the results of the warrant checks, Spivy continued to question James about his itinerary.  James changed his story and said he had travelled from Florida to Houston to pick up his son, Lavon.  *Id.* at 53-54.  Spivy asked James whether there were any guns, knives, large amounts of currency, heroin, cocaine, or marijuana in the vehicle, and James said no.  *Id.* at 52.  When asked about heroin and marijuana, however, James "broke eye contact."  *Id.*

Spivy then asked James whether he could search the vehicle, and James agreed.  *Id.* at 53.  Spivy prepared the consent form, Docket Item 328-2; instructed James to read the form aloud; and asked James whether he had any questions.  Docket Item 304 at 55-59.  James first said that he had a question, but he then said, "never mind" and that he would sign the form.  *Id.* at 59-60.

James signed the form.  *Id.*  The ensuing search of the Kia revealed the presence of cocaine, crack cocaine, and packaging material.  Docket Item 328-4.  Spivy then arrested James and the passengers.

### B.  Legal Framework

"Traffic stops are presumptively reasonable under the Fourth Amendment if the officer has probable cause to believe that a traffic infraction has occurred."  *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015) (citing *Wren v. United States*, 517 U.S. 806, 810 (1996)).  "If an officer has observed a traffic violation, his actual motivation for stopping the vehicle is irrelevant to whether the stop is constitutionally reasonable."  *Id.* (citing *Wren*, 517 U.S. at 813).

In *Rodriguez v. United States*, 575 U.S. 348 (2015), the United States Supreme Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id*. at 350.  Thus, "[a] seizure justified only by a police-observed traffic violation, . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation."  *Id*. at 350-51 (quoting *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)).  That "mission includes 'ordinary inquiries incident to [the traffic] stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id*. at 355 (quoting *Caballes,* 543 U.S. at 408).  An officer may also "conduct certain unrelated checks during an otherwise lawful traffic stop.  But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Id*.  Indeed, even *de minimis* extensions of a stop are unlawful.  *See Rodriguez*, 575 U.S. at 353-57 (rejecting Eighth Circuit's rule that "a *de minimis* intrusion on [the defendant's] Fourth Amendment rights [is] permissible" during a traffic stop).

Following *Rodriguez*, the Second Circuit decided *United States v. Gomez*, 877 F.3d 76 (2d Cir. 2017), finding that a short traffic stop had constituted an unconstitutional seizure.  The Court explained that "[e]ven assuming Gomez's detention lasted only five minutes," the evidence was unlawfully obtained because the officer had "extended the seizure to ask questions pertinent to 'an unrelated criminal investigation.'" *Id*. at 91 (quoting *Rodriguez,* 575 U.S. at 357).  Among other things, the Circuit clarified that its holding in *United States v. Harrison*, 606 F.3d 42 (2d Cir. 2010)—"that unrelated

12

questioning 'subsumed' in a five-to-six minute traffic stop does not measurably prolong a stop so as to render it unconstitutional"—did "not survive *Rodriguez*."  *Gomez*, 877 F.3d at 90.

"[T]he 'critical question,'" the *Gomez* Court explained, "is not whether the unrelated investigation 'occurs before or after the officer issues a ticket,' but whether conducting the unrelated investigation 'prolongs—*i.e.,* adds time to—the stop.'"  *Id.* at 89 (quoting *Rodriguez,* 575 U.S. at 357).  The court noted that even short extensions of a stop are unlawful: "the Court [in *Rodriguez*] specifically rejected the Government's contention that an officer may 'incrementally' prolong a stop to conduct an unrelated investigation 'so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances.'"  *Id.* (quoting *Rodriguez,* 575 U.S. at 357).  Rather, "tasks not related to the traffic mission, such as dog sniffs or '[o]n-scene investigation into other crimes,' are unlawful if they prolong the stop absent independent reasonable suspicion."  *Id.* (quoting *Rodriguez,* 575 U.S. at 356).  "[A]n officer does not 'earn bonus time to pursue an unrelated criminal investigation' by 'completing all traffic-related tasks expeditiously' because '[t]he reasonableness of a seizure . . . depends on what the police in fact do.'"  *Id.* (quoting *Rodriguez*, 575 U.S. at 357).

### 1.  The Initial Stop Was Legal.

The first question is whether Spivy had probable cause to believe that James committed a traffic violation.  *See Foreste*, 780 F.3d at 523.  Spivy testified that he stopped the car due to violations of Tennessee Code §§ 55-8-123(1) (leaving one's lane

of travel) and 55-8-132(h) (failure to reduce speed upon passing a stationary vehicle).

He subsequently issued a citation for these infractions.  Docket Item 304 at 97.

This Court has reviewed the video surveillance, Gov. Ex. 1A, and agrees with

Judge McCarthy's conclusion that for the reasons stated in the R&R, Spivy had

probable cause to believe that James committed those violations.  *See* Docket Item 352

at 4-5.  Therefore, the traffic stop was justified at its inception.[7]

### 2.    The Stop Was Unlawfully Extended.

The next inquiry is whether the stop was extended "beyond the time reasonably

required to complete th[e] mission' of issuing . . . ticket[s] for the violation[s]."

*Rodriguez*, 575 U.S. at 350-51.  The defendants argue that Spivy's asking "questions

about itinerary," which "were totally unrelated to the traffic infractions and were

obviously designed to elicit information he could use for further investigation,"

constituted an impermissible extension of the stop under *Rodriguez*.  Docket Item 362

at 23; Docket Item 364 at 20.  This Court agrees.

---

[7]  The defendants argue at length that the stop constituted racial profiling.  *See, e.g.*, Docket Item 519.  They say that Fuller could have had no reason to be suspicious other than having seen three black men in a car with out-of-state plates.  Docket Item 533 at 2.  And they say that Spivy therefore must have stopped the car based on Fuller's—or Spivy's own—racial profiling.  *Id.* at 12-15.  They may be correct.  But the Supreme Court and the Second Circuit have both clearly stated that an officer's subjective intent is irrelevant to the Fourth Amendment analysis.  *See United States v. Weaver*, 9 F.4th 129, 145 (2d Cir. 2021) (en banc) ("The Supreme Court has long rejected any attempt to inject subjectivity into the Fourth Amendment context.  '[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent [of the officer].'" (emphasis in original) (footnote omitted) (quoting *Whren*, 517 U.S. at 814)).  Therefore, even assuming the initial stop was triggered by racial profiling, it was permissible in light of the traffic violations.

### a. The Questions Regarding the Defendants' Travel History Were Unrelated to the "Mission" of the Traffic Stop.

The first question is whether Spivy's questions regarding the details of the defendants' travel itinerary were related to the "mission" of the traffic stop. *See Rodriguez*, 575 U.S. at 355. As the *Rodriguez* Court explained, "inquiries incident to [the traffic] stop"—such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"—do not impermissibly extend the time of the stop. *Id.* (quoting *Caballes,* 543 U.S. at 408). That is because "[t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*

Here, however, Spivy testified that "[t]he travel itinerary and the date [James] left from wherever he left" did not "have anything to do with the traffic tickets [Spivy was] going to issue." Docket Item 304 at 157. Thus, by Spivy's own unequivocal admission, those questions were not part of "th[e] mission' of issuing a ticket for the violation." *See Rodriguez*, 575 U.S. at 351 (quoting *Caballes,* 543 U.S. at 407). They were instead part of an "[o]n-scene investigation into other crimes," which *Rodriguez* explicitly states "detours from [a traffic stop's] mission." *Id.* at 356; *see also* Ex. 3500B at 85-86 (Spivy's explaining that the questions "ha[d] to do with [his] job being an interdiction agent, looking for criminal activity" and "he felt like [he] had an investigation that needed to be continued on the side of the road").

Notwithstanding Spivy's testimony, Judge McCarthy found that "Spivy's initial questioning of James Parks and the passengers was not improper." Docket Item 352 at 6. Relying on the Sixth Circuit's decision in *United States v. Stepp*, 680 F.3d 651 (6th

15

Cir. 2012), Judge McCarthy stated that "[a] traffic stop is not measurably extended by extraneous questioning even when such questioning undeniably prolongs the stop to a minimal degree," and "[q]uestions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer do not bespeak of a lack of diligence." Docket Item 352 at 6 (quoting *Stepp*, 680 F.3d at 662).  But *Stepp* was decided in 2012—three years before *Rodriguez*.  What is more, the Second Circuit's explicit abrogation of *Harrison* makes it clear that an officer does not have carte blanche to ask "[q]uestions relating to travel plans" as part of the "mission" of a traffic stop.

Reviewing the facts in *Harrison,* quite similar to those in this case, is instructive here.  In *Harrison,* as in this case, the officer "asked [the driver] where he was going, why, and with whom."  606 F.3d at 44.  The driver "responded that they were all returning to Utica from a wedding rehearsal in Rochester."  *Id.*  The officer "then went back to the three passengers to see if they would corroborate [that] account."  *Id.*  And as explained above, the Court in *Gomez* found that "*Harrison*'s holding" that a stop could be extended to ask such questions "d[id] not survive *Rodriguez*."  877 F.3d at 90. So too here.

The permissible "mission" of the traffic stop here was two-fold:  to issue James a traffic citation and to assess him for possible impairment.  Spivy did what he needed to do to fulfil those legitimate purposes in just a minute or two; everything else was a drug investigation.

Indeed, by Spivy's own admission, a drug investigation was the very purpose behind the stop.  *See* Docket Item 304 at 109-10 (Spivy's explaining that his "intent was to . . . observe the vehicle to see if it provided a reason, a violation of Tennessee statute

16

in order to conduct an investigation" and "if it ended up coming into drugs or narcotics, that was . . . a goal").  And "[a]lthough it is true that under *Whren* . . . , a police officer may stop a vehicle for a traffic offense when his or her actual motivation is to search for contraband, it is also true that the officer . . .  must not abuse the *Whren* principle by using it as a subterfuge to justify the recovery of contraband after an illegal stop and search."  *United States v. Freeman*, 209 F.3d 464, 467-68 (6th Cir. 2000) (Clay, *J.*, concurring) (collecting cases in which "interdiction officers stationed along Interstate 40 near Memphis have stopped a target vehicle, often on questionable or subjective probable cause grounds, and where the subsequent sequence of events repeat in a manner apparently crafted to justify a resulting detention and search").  Moreover, in the case of a pretextual stop—like this one—it is all the more crucial that this Court diligently adhere to the *Rodriguez* Fourth Amendment analysis and "not succumb to the temptation of allowing the end to justify the means."  *Id.* at 470.

For all those reasons, this Court finds that Spivy's questioning regarding the defendants' travel history and plans was "an inquiry unrelated to the traffic violation."  *See Gomez*, 877 F.3d at 90.

### b.    The Unrelated Questioning Prolonged the Stop.

Next, this Court must determine whether Spivy's unrelated questioning "prolong[ed]—*i.e.,* add[ed] time to—the stop."  *Rodriguez,* 575 U.S at 357.  When an officer asks unrelated questions while waiting for a response to a request for a record check, for example, that is not an extension of the stop, as the defendant would have been detained during that time either way.  *Compare Green*, 2018 WL 1136928, at *8 (denying motion to suppress where the officer "testified that after stopping the vehicle, he obtained identifications from both occupants, provided dispatch with their driver's

17

license numbers, . . . requested a full check," and "*[w]hile waiting for a response from dispatch*, . . . asked if there were any illegal narcotics in the vehicle, including large amounts of marijuana or United States currency" (emphasis added)), *with Gomez*, 877 F.3d at 91 (finding that stop was extended because "[e]ven assuming [the defendant]'s detention lasted only five minutes, [the officer] extended the seizure to ask questions pertinent to 'an unrelated criminal investigation'" (quoting *Rodriguez*, 575 U.S. at 357)).

Spivy admitted that he did not call in the plate and licenses until *after* he had questioned James and the occupants of the car, *see* Docket Item 304 at 143, so he was not waiting for a response when he questioned the three men.  Nor was this "a situation where one officer expeditiously completed all traffic-related tasks while another officer questioned the driver or conducted a dog sniff without extending the stop."  *Gomez*, 877 F.3d at 92.  Thus, like the officer in *Gomez*, Spivy was not waiting for the completion of any traffic-related tasks when he asked the unrelated questions.  Had Spivy conducted the unrelated questioning while he was waiting to hear back on a record check, or had he asked the questions while another officer completed "all traffic-related tasks," that may well have been permissible.  *See Green*, 2018 WL 1136928, at *8.  But that is not what happened.  The questions about the defendants' travel history—which undisputedly were unrelated to the traffic tickets—added time to the stop, and, therefore, were permissible only upon independent reasonable suspicion.  *See id.* at 91 (explaining that "[i]n applying *Rodriguez*, [courts] look to what [the officer] 'in fact d[id],' not whether 'the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances'" (quoting *Rodriguez,* 575 U.S. at 357)).

18

Judge McCarthy also relied on *United States v. Dunnigan*, No. 17-CR-0119-A, 2018 WL 3196953, at *3 (W.D.N.Y. June 29, 2018), to find that the questioning "was not improper." *See* Docket Item 352 at 6. But in *Dunnigan*, as in *Green*, the questioning did not extend the time of the stop:

> The key to resolving Dunnigan's objection is what Officer Gomez's partner, Officer Kniepp, was doing while Officer Gomez was asking questions unrelated to the traffic stop. During that time, Officer Kniepp was conducting one of the "ordinary inquiries incident to [a] traffic stop": running warrant checks. *Rodriguez*, [575 U.S. at 355]. Thus, the time it took for Officer Gomez to develop reasonable suspicion did not impermissibly prolong the stop because, during that time, Officer Kniepp was doing something he was entitled to do after Dunnigan was pulled over.

*Dunnigan*, 2018 WL 3196953, at *3. Here, by contrast, Spivy's minutes of questioning prior to calling in the warrant checks were precisely the type of "bonus time to pursue an unrelated criminal investigation" that *Rodriguez* prohibits. 575 U.S. at 357.[8]

At first blush, it may seem that hinging suppression on the order of events is splitting hairs. But that is exactly what *Rodriguez* and *Gomez* require. Those cases direct the court to make a simple inquiry: was the officer pursuing the mission of the traffic stop in some way, or did the officer get side-tracked and abandon the traffic stop's mission? Spivy's choice to spend several minutes on unrelated questioning prior to calling in any record checks undoubtedly "add[ed] time to . . . the stop" and, in so doing,

---

[8]   Judge McCarthy also cited *United States v. Estrada*, 459 F.3d 627 (5th Cir. 2006), another case decided before *Rodriguez*, in which the Fifth Circuit stated that "neither [its] prior cases nor any other caselaw institutes a per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions." Docket Item 352 at 8 (quoting *Estrada*, 459 F.3d at 631). But that is precisely what *Rodriguez* held: an officer may not extend the time of the stop for tasks unrelated to the stop. *Rodriguez*, 575 U.S. at 357.

unlawfully extended the seizure in violation of the Fourth Amendment.  *See Gomez*, 877 F.3d at 80 (quoting *Rodriguez,* 575 U.S. at 357).

To be clear, this Court is not saying that a police officer may not ask questions related to a traffic stop—including, when relevant to the stop, questions about where the driver is coming from and going to.  And, as noted above, an officer may ask even unrelated questions when they do not extend the stop.  Here, however, Spivy extended the stop by at least two full minutes with questions for the driver that he admitted were wholly unrelated to the "mission" of the stop, and he then questioned the passengers to see whether they would corroborate the driver's story.  *See* Docket Item 304 at 157 ("Q. The travel itinerary and the date he left from wherever he left, do either of those areas of inquiry have anything to do with the traffic tickets you were going to issue? A. No, sir.").  That is precisely the sort of detour that *Rodriguez* prohibits an officer from taking absent reasonable suspicion.

### 3.   Agent Spivy Did Not Have Reasonable Suspicion.

Because Spivy explicitly admitted that his questioning was unrelated to his "mission" of issuing the traffic tickets, Docket Item 304 at 157, and because that questioning extended the time of the stop, it was permissible only if Spivy had "the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Rodriguez*, 575 U.S. at 355.  Here, the Court need look no further than Spivy's own testimony to resolve that issue.

"Reasonable suspicion must be 'supported by articulable facts that criminal activity may be afoot,' and it cannot be based on 'inchoate suspicion or mere hunch.'" *Green*, 2018 WL 1136928, at *6 (internal citation omitted) (quoting *United States v.*

*Freeman*, 735 F.3d 92, 96 (2d Cir. 2013)).  "On a suppression motion, '[t]he

Government bears the burden of proof as to establishing' . . . reasonable suspicion."

*United States v. Goines*, 604 F. Supp. 2d 533, 539 (E.D.N.Y. 2009) (quoting *United*

*States v. Delossantos,* 536 F.3d 155, 158 (2d Cir. 2008)).  The Court "must look at the

'totality of the circumstances' of [the] case to see whether the detaining officer ha[d] a

'particularized and objective basis' for suspecting legal wrongdoing."  *Id.* (quoting *United*

*States v. Arvizu,* 534 U.S. 266, 273 (2002)); *see also United States v. Weaver*, 9 F.4th

129, 146 (2d Cir. 2021) (en banc) (explaining that the court must examine "the facts

known to the officers [at the time of the stop or search], and the reasonable inferences

that could be drawn from those facts, at that point in time").

Spivy explicitly testified—more than once—that he did not suspect "that criminal

activity may be afoot" when he extended the stop.  First, at a hearing in state court in

Tennessee, Spivy was asked: "Okay, you're looking for criminal activity.  And at this

point [when Spivy was questioning James about his travel itinerary], what do you have

to suggest criminal activity?· At the point where we are now?· You've got him back,

you've determined that he's not impaired."  Ex. 3500B at 86.  Spivy answered: "*Nothing*

*at this moment in time suggests criminal activity*."  *Id.* (emphasis added).

At the suppression hearing before Judge McCarthy, Spivy again was asked:

"During the suppression hearing in Tennessee you testified that at this point in time you

had nothing that suggested criminal activity.  Do you stand by that?"  He answered:

"Yeah, I stand by that.  What was suspicious was the travel itinerary. . . . But the

criminal activity, I would agree with that."  Docket Item 304 at 159; *see also* Docket Item

304 at 157 ("Q.  Up until this point that we've watched up to before you go talk to the

passengers, am I correct in saying that you had no suspicion of specific criminal activity?  A. I could not specify, you're correct."); Docket Item 332 at 44 ("Q. Okay.  So up until the point in time where you asked James Parks for consent to search his vehicle, you really didn't have any indication of any specific criminal activity, true?  A. Any specific criminal activity, that would be accurate.").[9]  In other words, when Spivy began his unrelated investigation about James's travel itinerary, he admittedly had no traffic-related reason to do so, nor did he have any suspicion of criminal activity.  At most, he had only the "inchoate suspicion" relayed—without explanation—by Fuller. Docket Item 304 at 17-18.[10]

Moreover, even assuming, for the sake of argument, that the first few questions about where James was coming from and going to were permissible as incident to the traffic stop, James's supposedly illogical travel route did not provide Spivy with reasonable suspicion to conduct further investigation.  *See id.* at 42.  As noted above,

---

[9]  Spivy testified that he initially thought James might be intoxicated, but he "very rapidly ruled out intoxication" as soon as he began speaking with James about the traffic violations.  Docket Item 304 at 146; *see also id.* at 43 ("Q. And during that personal exchange with him did you observe any indicia that he was under the influence of alcohol?  A. I did not, no, ma'am.  Once I -- once I began speaking to -- to James Parks, I could tell that his -- that his speech was fine.  And as you saw in the video, he actually interrupted me as I was -- as I was explaining the violation and told me that his -- his -- essentially his eyes were off the road because he was looking at his GPS.").

[10]  Because this Court agrees with Judge McCarthy that Spivy had probable cause to believe that James had committed a traffic violation, the basis for Fuller's "suspicion" is irrelevant.  *See Whren*, 517 U.S. at 813; *Weaver*, 9 F.4th at 145.  Even assuming, for the sake of argument, that the defendants are correct that Fuller's only basis for his suspicion was their race, *see* Docket Item 533, *Whren* precludes this Court from finding that such motivation invalidates Spivy's traffic stop.  *See supra* note 7. Nevertheless, it is incumbent on this Court to "carefully scrutinize [the] officer's stated reasons for detaining the individual beyond the purpose of the stop to [e]nsure that the reasons rise to the level of reasonable suspicion, so that the officer does not abuse his authority under *Whren*."  *United States v. Hill*, 195 F.3d 258, 267 (6th Cir. 1999).

Spivy repeatedly testified that while he thought the travel route was "odd," that did not give him any suspicion of criminal activity. *See* Ex. 3500B at 86; Docket Item 304 at 157, 159; Docket Item 332 at 23, 44. Nor does the case law suggest that a reasonable officer in Spivy's position would have had a reasonable suspicion of criminal activity based on the supposedly strange travel route. *See, e.g.*, *United States v. Simpson*, 609 F.3d 1140, 1152 (10th Cir. 2010) (noting that "if Mr. Simpson's evasiveness about his 'bizarre' travel plans were the only factor being used to establish reasonable suspicion, it would be insufficient by itself to establish reasonable suspicion"); *Joshua v. DeWitt*, 341 F.3d 430, 445 (6th Cir. 2003) ("As to Petitioner's travel route, while the route made no sense to the trooper, the route is not a fact suggestive of illegal conduct."); *see also Stepp*, 680 F.3d at 667 ("[W]e have held that an officer's knowledge that a defendant has a criminal history is not enough to create reasonable suspicion, even when combined with other weaker indicators such as nervousness and illogical travel plans.").

So what the "odd" travel route gave Spivy was precisely the type of "inchoate suspicion or mere hunch" that cannot found reasonable suspicion. And while the questions about travel plans may seem innocuous, *Rodriguez* made clear that an officer may not "'incrementally' prolong a stop to conduct an unrelated investigation" absent reasonable suspicion. *Gomez*, 877 F.3d at 89 (quoting *Rodriguez*, 575 U.S. at 357).

In fact, Spivy himself said that it was not until *after* he spent several minutes interviewing James and the other passengers that he had any articulable suspicion of criminal activity. *See* Docket Item 304 at 53 (Spivy's explaining that "based on the fact that I had gotten the conflicting stories, the origin of their trip, the duration of their trip, *then* I did become suspicious that there was possibly criminal activity and I suspected

that it was drugs" (emphasis added)); *see also* Ex. 3500B at 87 ("Q. . . . At this point [after speaking with the passengers] you now are suspicious of criminal activities; is that what you're telling us? A.· The possibility of it, yes, sir.  Q.·Well, are you suspicious? A.·Yes, sir.  Q.·Of criminal activity?  A.·Yes, sir.  Q.·And you consider that a reasonable suspicion? A.·Yes, sir.  Q.·And what activity are you suspicious of?  A. Well, at that moment in time, when I was -- once I had been given the conflicting stories . . . . ."). The government's papers implicitly concede that Spivy did not have reasonable suspicion until after speaking with the passengers.  *See* Docket Item 335 at 19 ("After the revised, but not reconciled, itinerary from James Parks [following the questioning of the passengers], and the unusual eye contact during his questioning about contraband, Spivy had indication of possible illicit activity.  He had reasonable suspicion that criminal activity may be afoot, and so he did his job.").  And Judge McCarthy likewise found that Spivy had reasonable suspicion based on "the contradictory travel history given by defendants" and the fact that "the Kia vehicle was nine days overdue"—that is, only after Spivy had questioned James and the passengers.  *See* Docket Item 352 at 7.

Thus, this Court finds that the government has not met its burden of proving that Spivy had reasonable suspicion at the time he extended the traffic stop.  As a result, the evidence must be suppressed.

### 4.    The Consent to Search Did Not Validate the Search.

Even though James subsequently signed a consent to search form, "[a]n illegal stop invalidates a defendant's consent to search unless the Government can demonstrate that the taint of the unlawful stop 'had been dissipated before the consent was given.'"  *United States v. Murphy*, 778 F. Supp. 2d 237, 255–56 (N.D.N.Y. 2011),

24

*aff'd*, 703 F.3d 182 (2d Cir. 2012) (quoting *United States v. Montilla,* 928 F.2d 583, 590 n. 3 (2d Cir. 1991)).  "The Government bears the burden of proving a break in the causal chain."  *Id.* (citing *Brown v. Illinois,* 422 U.S. 590, 604 (1975)).

Here, the government does not even attempt to argue—nor does the Court see any basis to find—that there was a break in the causal chain between the illegal extension of the stop and the consent to search.  On the contrary, the only reason Spivy asked James for consent to search was the information he gleaned from his unlawful investigation.  Docket Item 304 at 53 ("Q. Why did you ask him for consent to search? A. Because I was -- I was suspecting that there were – that they were involved in criminal activity . . . based on the fact that I had gotten the conflicting stories . . . .").  And Spivy admitted that James was not "free to leave up until the point that he signed the consent form."  Docket Item 304 at 170.

* * *

In sum, because Spivy extended the traffic stop without having reasonable suspicion of criminal activity—indeed, he explicitly admitted that he did not—the evidence obtained from the subsequent search must be suppressed.[11]

---

[11]  Because this Court finds that the evidence must be suppressed on this basis, it need not address the defendants' other arguments, including that Spivy's frisking James was unlawful.

## II.    BILL OF PARTICULARS

Lavon also objects to Judge McCarthy's denial of his motion for a bill of particulars.  Docket Item 364 at 18-20.  "The Court will reconsider a magistrate judge's order pertaining to discovery issues (including the granting or denial of a bill of particulars) only if the magistrate judge's determination was 'clearly erroneous or contrary to law.'"  *United States v. Louissaint*, 2016 WL 543238, at *1 (W.D.N.Y. Feb. 10, 2016) (quoting 28 U.S.C. § 636(b)(1)(A)).  Because Judge McCarthy's decision to deny Lavon's request for a bill of particulars was neither clearly erroneous nor contrary to law, this Court will not revisit it.

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  But "[a] bill of particulars is not to be used as a discovery device to obtain evidentiary detail about the [g]overnment's case."  *United States v. Ralston*, 2021 WL 5054464, at *1 (S.D.N.Y. Nov. 1, 2021).  "Thus, one should be ordered only where the information sought is necessary to prepare a defense or to avoid double jeopardy." *Id.* (citation and internal quotation marks omitted).

Lavon argues that he "is simply asking the date the Government is alleging he entered and exited the conspiracy" and "[c]ourts have granted particulars for this information."  Docket Item 364 at 19 (citing *United States v. Taylor*, 707 F. Supp. 696, 700 (S.D.N.Y. 1989); *United States v. Strawberry*, 892 F. Supp. 519, 527 (S.D.N.Y. 1995); *United States v. Ramirez*, 54 F. Supp. 2d 25, 30 (D.D.C. 1999)).  But as Judge

McCarthy observed, other courts have held that "the government need not specify when a particular defendant joined the conspiracy, nor is it required to specify what role each defendant played in the conspiracy . . . . Similarly, to the extent that defendants seek a description of the particular acts for which he or she is being held responsible, or a listing of the acts of which each defendant had knowledge, the case law is clear that the government is not required to provide the information."  Docket Item 252 at 11 (quoting *United States v. James*, 2007 WL 914242, *26 (E.D.N.Y. 2007)); *see also United States v. Nicolo*, 523 F. Supp. 2d 303, 317 (W.D.N.Y. 2007), *aff'd*, 421 Fed. App'x 57 (2d Cir. 2011) (summary order) ("As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars.  More specifically, details regarding the date on which the conspiracy was formed, or when each participant entered into the conspiracy need not be revealed before trial." (quoting *United States v. Urso*, 369 F. Supp. 2d 254, 272-73 (E.D.N.Y. 2005))).  Based on that case law, this Court cannot say that Judge McCarthy's conclusion was clearly erroneous or contrary to law.

## III.   MOTION TO STRIKE LAVON PARKS'S <u>PRO SE</u> OBJECTION

Finally, the government moves to strike Lavon's 42-page *pro se* objection, attached as an exhibit to his counsel's brief.  Docket Item, 364-1.  This Court has reviewed Lavon's objection and determined that none of his arguments change or affect this Court's decision in any way.  As a result, the government's motion to strike is denied as moot.

## CONCLUSION

For the reasons stated above, it is hereby ORDERED that the May 2020 RR&O, Docket Item 252, is ADOPTED, and the defendants' motions to dismiss count 3 of the superseding indictment for improper venue, Docket Items 202 and 203, are GRANTED; the defendants' motions for bills of particulars, Docket Items 202 and 204, are DENIED; Lavon's motion for a pretrial *Wade* hearing, Docket Item 203, is DENIED; and Lavon's second motion, Docket Item 229, is DENIED; and it is further

ORDERED that the March 2021 R&R, Docket Item 352, is ADOPTED IN PART and MODIFIED IN PART, and the defendants' motions to suppress, Docket Items 109, 202, and 203, are GRANTED; and it is further

ORDERED that this Court will hold a status conference regarding the July 2020 RR&O, Docket Item 292, in light of its decision on the motions to suppress, and the Court will subsequently render a decision on the objections to that RR&O, if necessary; and it is further

ORDERED that the government's motion to strike Lavon's *pro se* objections is denied as moot.

SO ORDERED.


Dated:      June 3, 2022
            Buffalo, New York


_____
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE