UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────

UNITED STATES OF AMERICA,

     v.

LAVON PARKS and JAMES C. PARKS,

         Defendants.

───────────────────────────

19-CR-87-LJV-JJM
DECISION & ORDER

On December 29, 2023, a jury convicted the defendants, Lavon Parks ("Lavon") and James C. Parks ("James"), of various drug and firearm offenses.[1]  *See* Docket Item 1057.  More specifically, the jury convicted both Lavon and James of conspiring to possess narcotics—including at least 5 kilograms of cocaine, at least 400 grams of fentanyl, and at least 100 grams of heroin—with the intent to distribute them (count 1); discharging a firearm in furtherance of a drug trafficking crime (count 4); and discharging a firearm causing death (count 5).  *See id.*  The jury also convicted Lavon of attempting to possess 500 grams or more of cocaine with the intent to distribute it (count 2) and possessing a firearm in furtherance of a drug trafficking crime (count 3). *See id.*

Approximately six months later,[2] Lavon and James moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, a new trial

───────────────────

[1] Because the defendants have the same last name, the Court will refer to them by their first names solely for ease of reference.

[2] The defendants made several unopposed motions for extensions of time, each of which the Court granted.  *See* Docket Items 1060, 1065, 1083, 1085, 1111, 1129.

under Federal Rule of Criminal Procedure 33.  Docket Items 1134 and 1135.  The
government responded, Docket Item 1171, and Lavon and James replied, Docket Item
1172 and 1173.  The Court then heard oral argument and ordered supplemental
briefing.  *See* Docket Item 1178.

On February 27, 2025, Lavon filed a letter arguing that the United States
Supreme Court's recent decision in *Glossip v. Oklahoma*, 604 U.S. 226 (2025),
supported the arguments raised in the defendants' post-trial motions.  Docket Item
1179.  After the government responded to that letter, Docket Item 1187, Lavon replied,
Docket Item 1192.

The defendants then filed a letter alerting the Court to their "recent discovery that
Alphonso Diggs"—whom the defendants described as "the government's star
witness"—had been "arrested September 3, 2022[,] and charged with driving while
impaired by drugs."  Docket Item 1195.  The defendants followed that submission with a
motion under Federal Rule of Criminal Procedure 17(c) requesting an order for a post-
trial subpoena related to Diggs's arrest.  Docket Item 1197.  The government
responded, Docket Item 1198, and the defendants replied, Docket Item 1200.  The
Court then held a status conference on June 26, 2025, and granted the motion to issue
the Rule 17 subpoena.  *See* Docket Item 1204.  The Court also directed the government
to produce "any reports extracted from[,] and knowledge as to the whereabouts of[,] cell
phones from Milton Williams and William Putman" and to confirm that "all reports from"
the Drug Enforcement Administration ("DEA") about Daniel Wilson had "been turned
over to [the] defense."  *See id.*

2

On July 22, 2025, after receiving documents in response to the subpoenas, the defendants filed a supplemental memorandum in support of their post-trial motions and their request for an evidentiary hearing. Docket Item 1210. The government responded to that supplemental memorandum, Docket Item 1217, and the defendants replied, Docket Item 1224. In the meantime, the government filed its supplemental brief concerning Williams's and Putman's cell phones, Docket Item 1212, and the defendants responded to that submission, Docket Item 1223.

After careful review of the complex and voluminous submissions, this Court grants in part and denies in part Lavon's Rule 29 motion. More specifically, the Court grants the motion as to count 2 but otherwise denies it. The Court denies James's Rule 29 motion, denies both defendants' Rule 33 motions, and denies their request for an evidentiary hearing.

## DISCUSSION[3]

## I.    RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

After a jury verdict, a defendant may challenge the sufficiency of the evidence presented at trial by moving for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c)(1). Convincing a court to set aside a verdict, however, is no easy task. A jury's verdict will withstand a Rule 29 challenge so long as "any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v.*

---

[3] The Court assumes the reader's familiarity with the factual background and will refer to the facts only as necessary to explain its analysis.

*Ortega*, 2023 WL 6140929, at *4 (S.D.N.Y. Sept. 20, 2023) ("The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (quoting *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013))).  The court views the evidence in the light most favorable to the government and draws all inferences in the government's favor.  *See United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991) (collecting cases).  And the court may not substitute its own judgment on credibility or the weight of the evidence for what the jury decided.  *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).[4]

## A.    Count 1 (Narcotics Conspiracy)

"A narcotics conspiracy that involves [a certain quantity of drugs] . . . requires that the [g]overnment prove the existence of the conspiracy, that the defendant willfully joined it, and the drug quantity."  *United States v. Hicks*, 5 F.4th 270, 275 (2d Cir. 2021).  "[T]he 'existence of and participation in a conspiracy may be established through circumstantial evidence.'"  *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984) (alterations and emphasis omitted) (quoting *United States v. Sanzo*, 673 F.2d 64, 69 (2d

---

[4] Lavon makes several arguments in support of his Rule 29 motion that do not appear to be, at least directly, about the sufficiency of the evidence. *See, e.g.*, Docket Item 1135 at 83 (arguments regarding alleged *Brady* violations), 89 (arguments regarding rebuttal summation).  But "[a] Rule 29 motion for acquittal may be granted only on the ground that the evidence against a defendant is insufficient." *United States v. Jabali,* 105 F. App'x 311, 313 (2d Cir. 2004) (summary order) (collecting cases). Accordingly, the Court considers the arguments that do not address the sufficiency of the evidence in the sections below discussing Rule 33 and other arguments. *See infra* Sections II and III.

Cir. 1982)).  But "there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."  *Id.*

### 1.    Evidence on Count 1

Count 1 charged both defendants with participating in a conspiracy "[b]etween in or about February 2017 . . . and on or about May 6, 2019, . . . to possess with intent to distribute, and to distribute" narcotics, including "5 kilograms or more of a mixture and substance containing cocaine, . . . 400 grams or more of a mixture and substance containing [fentanyl,] and . . . 100 grams or more of a mixture and substance containing heroin."  Docket Item 712 at 1-2.  The government presented ample evidence that Lavan and James conspired with others during that time period to distribute those amounts of drugs.

First, William Putman testified that during the first half of 2017—in fact, until May of that year when Putman was arrested—Putman bought heroin from Lavon.  Docket Item 1061 at 27-38.  According to Putman, Lavon would give Putman 250 grams of heroin to sell every one to two weeks.  *Id.* at 37-38.  There were one or two instances where Lavon gave Putman "[a] half a kilo" at time.  *Id.* at 38-39.  Putman said that he paid Lavon "in cash and sometimes [in] guns."  *Id.* at 40.  And Putman testified that James "came a few times with Lavon when [Putman] . . . bought drugs from [Lavon]" and that James "was driving."  *Id.* at 50-51.

Coconspirator Felix Calderon-Valcarcel testified that beginning in December of 2017 or January of 2018, he supplied Lavon with kilogram quantities of cocaine, heroin, and fentanyl for distribution in the Niagara Falls area.  *See* Docket Item 1062 at 38-67.

Calderon-Valcarcel testified in detail about his methods of distribution to Lavon, the specific drugs and quantities he sold to Lavon, and prices he charged Lavon. *See id.* In particular, Calderon-Valcarcel said that between December 2017 and March 2019, he sold "[n]o less than 20 kilos" of cocaine and "5 kilos or more" of heroin and fentanyl to Lavon. *See id.* at 39, 53. And Calderon-Valcarcel said that there were several times when Lavon sent James to drop "off money for [a] drug debt owed by Lavon." *Id.* at 65-66.

Calderon-Valcarcel also testified that, as part of the conspiracy, he began selling heroin and fentanyl to a person named "Sonny" whom he later learned was a government informant. *See id.* at 67-70. And the government played video recordings of Calderon-Valcarcel speaking with Lavon and obtaining drugs from Lavon to sell to Sonny. *See id.* at 69-87.

"[E]ven the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not incredible on its face [and] does not defy physical realities." *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (alteration, citations, and internal quotation marks omitted). There was nothing "incredible" about Putman's and Calderon-Valcarcel's testimony, nor did either "defy physical realities." What is more, Calderon-Valcarcel and Putman were far from the only witnesses. Their testimony was corroborated by, among others, Lavon's former girlfriend, Tanesha Williams; Calderon-Valcarcel's former girlfriend, Yarimar Berrios-Alvarado; and Alfonso Diggs. *See generally* Docket Items 1010, 1021, and 1112.

For all those reasons, this Court finds there was sufficient evidence showing that Lavon and James conspired with others to distribute the amounts of narcotics charged in the indictment.

### 2.    Amendment or Variance

That is not the end of the inquiry on count 1, however. The defendants argue that the government's evidence at trial resulted in a constructive amendment of or prejudicial variance from the indictment because the government presented evidence of multiple conspiracies. Docket Item 1135 at 35-57; Docket Item 1134 at 65. They urge the Court to reject the government's contention that Lavon "was the hub of a single, overall conspiracy," the first part of which involved Lavon's "dealings with William Putman in early 2017, with Diggs who was never charged in the indictment, and with Milton Williams . . . despite the fact none of them were charged." *See* Docket Item 1135 at 40. And, they say, "[n]either Putman . . . nor Milton Williams" knew Calderon-Valcarcel, who was charged as a coconspirator. *See id.* Instead, they say that Lavon's interactions with Putnam were part of a different conspiracy than Lavon's dealings with Calderon-Valcarcel. Thus, the defendants contend, there was insufficient evidence to sustain the verdict on count 1 as charged in the indictment.[5]

"To prevail on a constructive amendment claim, a defendant must demonstrate that 'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other

---

[5] Alternatively, they argue that the constructive amendment or prejudicial variance entitles them to a new trial.

than that charged in the indictment.'" *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (quoting *United States v. Mollica,* 849 F.2d 723, 729 (2d Cir. 1988)). "By contrast, '[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *Id.* at 417 (quoting *United States v. Salmonese,* 352 F.3d 608, 621 (2d Cir. 2003). Whereas a "constructive amendment [i]s a per se violation of the Grand Jury Clause requiring reversal, . . . [a] variance in proof rises to a constitutional violation only if it infringes on the notice and double jeopardy protections of an indictment." *Id.* (italics omitted). And the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial." *Id.* (quoting *United States v. Rigas,* 490 F.3d 208, 228 (2d Cir. 2007)).

"It is the [g]overnment's burden to establish the conspiracy alleged in the indictment, and whether this burden has been met is ordinarily a question of fact for the jury." *United States v. Taylor*, 562 F.2d 1345, 1351 (2d Cir. 1977) (citation and internal quotation marks omitted); *see also United States v. Armedo-Sarmiento*, 545 F.2d 785, 789 (2d Cir. 1976) (explaining that "whether the evidence has established multiple conspiracies rather than a single one is ordinarily a question of fact for the jury"). The Court's "task on review is to determine whether the legal standard given to the jury . . . in its charge was correct and whether, viewing the proof in the light most favorable to the [g]overnment, there was sufficient evidence to permit the jury to find the single conspiracy alleged." *See Taylor*, 562 F.2d at 1351.

Here, the defendants seem to assume that because Calderon-Valcarcel was indicted with them, he must have been involved in the entire conspiracy. But the

caselaw does not support that contention. *See United States v. Eppolito*, 543 F.3d 25, 48 (2d Cir. 2008) ("[C]hanges in membership do not necessarily convert a single conspiracy into multiple conspiracies, . . . especially where the activity of a single person was central to the involvement of all." (citation and internal quotation marks omitted)); *United States v. Berger*, 224 F.3d 107, 114-15 (2d Cir. 2000) ("[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990))). Nor is there a requirement that all the members of the conspiracy knew each other or interacted. *See United States v. Ohle*, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010) ("Each member of the conspiracy is not required to have conspired directly with every other member of the conspiracy; a member need only have 'participated in the alleged enterprise with a consciousness of its general nature and extent.'" (quoting *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989))). And it is within the government's discretion to choose which coconspirators to indict; it need not indict all of them. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978))).

Moreover, the Court instructed the jury on multiple conspiracies as the defense requested:

> In this case, the defendants contend that the government's proof fails to show the existence of one conspiracy. Rather, they claim that there were

9

actually several separate and independent conspiracies with various groups of members.

Whether there was a single unlawful agreement, or many such agreements, or indeed, no agreement at all, is question of fact for you, the jury, to determine in accordance with the instructions [I] am about to give you.

When two or more people join together to further one common unlawful design or purpose, a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate, unlawful agreements to achieve distinct purposes.

Proof of several separate and independent conspiracies is not proof of the single, overall conspiracy charged in the indictment, unless one of the conspiracies proved happens to be the single conspiracy described in the indictment.

You may find that there was a single conspiracy despite the fact that there were changes in either the members of the conspiracy, or the activities of the conspirators, or both, as long as you find that some of the co-conspirators continued to act for the entire duration of the conspiracy for the purposes charged in the indictment. The fact that the members of a conspiracy are not always identical does not necessarily imply that separate conspiracies exist.

On the other hand, if you find that the conspiracy charged in the indictment did not exist, you cannot find any defendant guilty of the conspiracy. This is so even if you find some conspiracy other than the one charged in this indictment existed, even though the purposes of both conspiracies may have been the same, and even though there may have been some overlap in membership.

Similarly, if you find that a particular defendant was a member of another conspiracy and not the one charged in the indictment, then you must find that defendant not guilty of conspiracy.

In other words, you must first determine whether the conspiracy charged in the indictment existed. If it did, you then must determine the nature of the conspiracy and who were its members.

Docket Item 1135 at 46-47 n.30; *see* Docket Item 578 at 28. Notwithstanding that instruction and the defendants' arguments that there were multiple conspiracies rather than the single conspiracy charged in count 1, the jury found otherwise. *See* Docket Item 1057.

As noted above, "[w]hether the government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or, instead, has proven several independent conspiracies is a question of fact for a properly instructed jury." *United States v. Johansen*, 56 F.3d 347, 350 (2d Cir. 1995), *as amended* (May 11, 1995). And contrary to the defendants' arguments, there was ample basis for the jury to find—as the government argued—that Lavon was the "the top man" in one conspiracy that involved James and various other members who changed over time and did not necessarily know or interact with every other member. *See supra* Section I.A.1 (describing evidence on count 1); *see also* Docket Item 1077 at 75 (government's closing argument) ("Is it a different conspiracy? No. This is Lavon Parks and Putman who started this conspiracy, now you're adding Felix and Diggs."). This Court may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *See United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999).

For all those reasons, this Court finds there was no constructive amendment or prejudicial variance for count 1 and that the evidence was sufficient to support the convictions.[6]

### 3. James Parks's Intent to Join the Conspiracy

James also argues that there was insufficient evidence to demonstrate his specific intent to join in the charged conspiracy. Docket Item 1134 at 38-56. But

---

[6] For the same reasons, the Court finds that the defendants are not entitled to a new trial on this basis.

multiple witnesses testified that James played a supporting role to help his son, Lavon, sell drugs. *See generally* Docket Items 1061, 1062, 1070, 1072, and 1112.

For example, as explained above, Putman testified that James "came a few times with Lavon . . . when [Putman] bought drugs from [Lavon]" and that James "was driving." Docket Item 1061 at 50-51. On one of those times when James was driving, Lavon gave Putman "250 grams of heroin" and Putman gave Lavon "5,000 in cash" and "four .40 caliber[]" firearms with the serial numbers "filed . . . off." Docket Item 1034 at 3-6. Putman also said that on one occasion when Putman owed Lavon money, Lavon told Putman "to go to his dad" and "give him the money," which Putman did.[7] Docket Item 1061 at 53-54. But there was more.

Dezeray Wilson testified that she "observed kilogram quantities of heroin and cocaine being dealt between [sic]" Diggs, Lavon, and Calderon-Valcarcel, Docket Item 1070 at 24; that she "received stuff from Lavon and his father," *id.* at 26; and that on "[q]uite a few" occasions, she picked up drugs from James at his home, *id.* at 27. Yarimar Berrios-Alvardo, Calderon-Valcarcel's girlfriend, testified that Lavon would come to her house to pick up packages from Calderon-Valcarcel or drop off money and that James was with him once. *See* Docket Item 1112 at 18-24. Berrios-Alvardo also said that on several occasions when she accompanied Calderon-Valcarcel to Lavon's or James's house in Niagara Falls, she would wait in the car while Calderon-Valcarcel "went inside to talk to [Lavon and James]" and that "the three of them" would come out afterwards. *Id.* at 24-25. Lindsey Groffenberg testified that she purchased heroin from

---

[7] Putnam also testified that there was another time in March or April 2017 that Putman lent Lavon an AK-47 because Lavon "had some problems with somebody," and James came with Lavon to pick up the gun. Docket Item 1034 at 8-10.

both James and Lavon and that she would sometimes see James and Lavon "[d]riving around" together.  Docket Item 1072 at 27-28, 32-36, 88.  And, as noted above, Calderon-Valcarcel testified that there were several times that Lavon sent James to drop "off money for [a] drug debt owed by Lavon."  Docket Item 1062 at 65-66.

What James asks this Court to do is precisely what Rule 29 prohibits: finding those witnesses not to be credible, drawing inferences in his favor rather than in the government's, or both.  And he asks this Court to do that on a charge particularly suited to resolution by the jury:  As the Second Circuit has noted, the "standard of deference [to the jury] is especially important when reviewing a conviction of conspiracy."  *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992); *see United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) ("In cases of conspiracy, deference to the jury's findings is especially important because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." (internal quotation marks omitted)).

This Court cannot look at each witness's testimony "in isolation"; rather, the Court must look at the "totality" of the evidence.  *See United States v. Huezo*, 546 F.3d 174, 178 (2d Cir.  2008).  Doing that—and drawing all inferences in the government's favor, as this Court must on a Rule 29 motion—the Court finds that the evidence was sufficient for a reasonable juror to find that James intentionally joined the conspiracy.

### 4.    Proof of Drug Quantities as to James Parks

James next argues that there was insufficient evidence of the quantities of drugs that he allegedly conspired to distribute.  Docket Item 1134 at 30-38.  Indeed, James says that he was directly involved only with a much smaller quantity of drugs and that

the proof was insufficient to connect him with his son's larger conspiracy. *Id.* Thus, James argues, the jury's verdict on those drug quantities cannot stand.[8] *Id.* at 38.

"The drug quantity attributable to a defendant knowingly participating in a drug distribution conspiracy includes (1) transactions in which he participated directly, (2) transactions in which he did not personally participate, but where he knew of the transactions *or they were reasonably foreseeable to him*, and (3) quantities he agreed to distribute or possess with intent to distribute 'regardless of whether he ultimately committed the substantive act.'" *United States v. Pauling*, 924 F.3d 649, 657 (2nd Cir. 2019) (emphasis added) (quoting *United States v. Jackson*, 335 F.3d 170, 181 (2d Cir. 2003)).

James's argument about drug quantities fails for the same reason that his argument about joining the conspiracy failed: it does not credit the testimony of the government's witnesses or draw all inferences in the government's favor, as this Court must on a Rule 29 motion. Based on the testimony of multiple witnesses about James's involvement in the conspiracy, *see supra* Section I.A.3, the jury could reasonably infer that James was aware of—or at least could reasonably have foreseen—the full scope of the conspiracy and the amounts of drugs involved.

---

[8] If the Court were to grant James's motion on this point, it could enter judgment on a lesser included offense involving a smaller drug quantity. *See United States v. Pauling*, 924 F.3d 649, 652 (2d Cir. 2019).

### B.    Count 2 (Attempt to Possess 500 Grams or More of Cocaine with Intent to Distribute It)

Lavon's Rule 29 argument on count 2 is based on improper venue.  Docket Item 1135 at 11-22.  Count 2 charged that Lavon attempted to possess 500 grams or more of cocaine with intent to distribute it "[o]n or about May 26, 2017."  Docket Item 712 at 2. More specifically, the government alleged that Lavon had met someone named "Orlando" during a trip to Puerto Rico in January 2017.  *See* Docket Item 1171 at 5. Lavon and Orlando kept in touch in the months following the trip, and Lavon returned to Puerto Rico in May 2017.  *See id.* at 5-6.  According to the government, while on that second trip, Lavon obtained cocaine from Orlando and mailed it back to Niagara Falls. *See id.*  And on May 31, 2017, a postal inspector in Buffalo intercepted the package Lavon had mailed and, after obtaining a federal search warrant, opened the package and found nearly a kilogram of cocaine.  *See id.* at 6.

In July 2023, this Court found that the government's failure to disclose "investigative reports relating to the attempted controlled delivery, [an] interview of Daniel Wilson, and [a] photo array from which Wilson identified Devante Gregory as the person who hired him to sign for the package shipped from Puerto Rico" constituted a *Brady* violation with respect to count 2.[9]  *See* Docket Item 872 at 21-23.  As a sanction, the Court prohibited the government from eliciting any evidence that Lavon was mailing

---

[9] The government had originally told this Court that when Wilson said that he was contacted by "D" in connection with picking up the drugs in Western New York, he meant "Dutch"—a nickname for Lavon.  *See* Docket Item 737 at 17.  But the government later informed the Court that "D" meant Devonte Gregory, not Dutch.  *Id.* at 38-39.  This Court stated that although it had "no doubt that the government's mistake was unintentional and inadvertent[,] . . . the identification of someone other than Lavon Parks was *Brady* material."  Docket Item 872 at 13 n.10.

the package of cocaine from Puerto Rico to himself or to someone else in his conspiracy. *See id.*  The question, therefore, is whether—without those facts—there was sufficient evidence to establish venue in the Western District of New York.

"[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda,* 347 F.3d 471, 483 (2d Cir.2003).  And "[w]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the constitution does not command a single exclusive venue." *Id.* at 482 (quoting *United States v. Reed,* 773 F.2d 477, 480 (2d Cir. 1985)).  "Rather, venue is proper 'in any district in which such offense was begun, continued, or completed.'" *Id.* (quoting 18 U.S.C. § 3237(a)).

"Because it is not an element of the crime, the government bears the burden of proving venue by a preponderance of the evidence."  *United States v. London*, 148 F. App'x 19, 23 (2d Cir. 2005) (quoting *United States v. Geibel,* 369 F.3d 682, 695-96 (2d Cir. 2004)).  The "Court reviews the sufficiency of the evidence as to venue in the light most favorable to the government, crediting 'every inference that could have been drawn in its favor.'"  *Id.* (quoting *Geibel,* 369 F.3d at 696).

Count 2 charged Lavon with attempting to possess at least 500 grams of cocaine with the intent to distribute it.  Docket Item 712 at 2.  To establish "an attempt to commit a crime"—as count 2 charges—"the government must prove that the defendant had the intent to commit the crime and engaged in conduct amounting to a substantial step towards the commission of the crime."  *United States v. Pugh*, 945 F.3d 9, 20 (2d Cir.

2019) (citation omitted). To qualify as a "substantial step," the action must be "more than mere preparation," but it "may have stopped short of the last act necessary for the actual commission of the substantive crime." *Id.* (citation and internal quotation marks omitted).

The elements of possession with intent to distribute cocaine are: (1) that the defendant "possessed" the amount of cocaine charged; (2) that the defendant "possessed the cocaine with the intent to distribute" it; and (3) that the defendant "did so knowingly." *See United States v. McKenzie*, 13 F.4th 223, 239 (2d Cir. 2021) (citing *United States v. Gore*, 154 F.3d 34, 45 (2d Cir. 1998)). "Possession with intent to distribute narcotics may be established by proof of the defendant's actual or constructive possession of the narcotics." *Id.* (quoting *United States v. Snow*, 462 F.3d 55, 69 (2d Cir. 2006)). "Constructive possession requires that the defendant have the 'power and intention' to exercise 'dominion and control' over the narcotics, 'either directly or through others.'" *Id.* (quoting *United States v. Albarran*, 943 F.3d 106, 118 (2d Cir. 2019)).

So the question here boils down to whether the government has proved by a preponderance of the evidence that Lavon "cause[d] an act in furtherance of [attempting to possess 500 grams or more of cocaine] to occur in" this District. *See Svoboda,* 347 F.3d at 483. And to answer that, the Court must determine whether he took a substantial step—beyond mere preparation—*in the Western District of New York* toward possessing 500 grams or more of cocaine with intent to distribute it, as is required for an attempt crime. Although a close call, the Court finds that the actions Lavon took in the

Western District of New York were merely preparatory and that venue therefore is improper in this District.

The government relies on the following evidence to establish venue on count 2: (1) Lavon and his girlfriend, Tanesha Williams, traveled to Puerto Rico in January 2017, and during that trip, Lavon met someone named "Orlando"; (2) Lavon stayed in touch with Orlando through FaceTime when he returned home to Western New York; (3) Williams testified that Lavon had no legitimate job at that time and that he sold heroin, cocaine, and marijuana for a living; and (4) when Lavon and Williams returned to Puerto Rico in May 2017, Lavon spent most of his time "with Orlando alone." *See* Docket Item 1171 at 5-6. Based on all that, the government says that the FaceTime conversations between Orlando and Lavon, together with Lavon's purchase of a plane ticket back to Puerto Rico, were "substantial steps" toward Lavon's possessing cocaine with the intent to distribute it. *Id.* at 7. And viewing the evidence in its favor, the government argues, "[t]he jury could have reasonably inferred . . . that Orlando was [Lavon]'s cocaine supplier" and that Lavon "planned and ordered the kilogram of cocaine through his multiple communications with Orlando from his home in Niagara Falls." *See id.*

But even if the government had proof that Lavon and Orlando agreed to buy and sell drugs during the FaceTime conversations—and there was no such evidence presented at trial—"evidence of a verbal agreement alone, without more, is insufficient as a matter of law to support an attempt conviction." *United States v. Delvecchio*, 816 F.2d 859, 862 (2d Cir. 1987). In *Delvecchio*, the Second Circuit vacated the defendants' convictions for attempting to possess heroin. *See id.* The court explained that the "proof at best established that [the defendants] sought out [Lorenzo] DiChiara, a

18

supplier of narcotics; attempted to contact DiChiara by sending him flowers; met with DiChiara on May 11 and May 17, 1983; and agreed on the price for five kilograms of heroin, the terms of payment, and the date and time of the proposed transaction." *Id.* But the defendants did not show up at the meeting, scheduled for May 18, and there was no evidence that they "had set out for the meeting site but turned back." *Id.* Nor "had either [defendant] acquired or attempted to acquire the almost one million dollars necessary to complete the purchase." *Id.* So aside from the verbal agreement, there were no concrete steps taken toward possessing the heroin. *See id.*

That precedent colors this Court's venue analysis. As explained above, for venue to be proper, the defendant must either have "intentionally or knowingly cause[d] an act in furtherance of the charged offense to occur in the district of venue" or it must be "foreseeable that such an act would occur in the district of venue." *See Svoboda,* 347 F.3d at 483; *see also id.* at 482 (explaining that "venue is proper in any district in which such offense was begun, continued, or completed" (citation and internal quotation marks omitted)). So here, the government had to show that Lavon did something that "beg[a]n, continued, or completed" his attempt crime in this District. And, based on *Delvecchio*, a mere verbal agreement or arrangement is not enough.

The Second Circuit's decision in *United States v. Bozza,* 365 F.2d 206 (2d Cir. 1966), also is instructive. There, the defendants were convicted in the Eastern District of New York of receiving stolen government property in violation of 18 U.S.C. § 641. *See Bozza,* 365 F.2d at 220. But "[t]he only acts shown to have occurred in the Eastern District of New York . . . were [one defendant's] making and receiving telephone calls on a visit to Brooklyn for an unspecified purpose, during which he agreed to buy the

stamps stolen from Hillsdale and bargained about the price, and his driving from the point of the call to Manhattan to receive them." *Id*. The court rejected the government's argument that the phone call was more than mere preparation for the offense, vacated the conviction, and dismissed the count for lack of venue in the Eastern District. *Id*. at 221.

With that background in mind, the Court concludes that Lavon's FaceTime conversations with Orlando were not enough to support venue in this District. First, there was no evidence about the topics of the conversations. Indeed, as Lavon notes, "[t]here was no testimony that any of the FaceTime conversations [even] involved drugs." Docket Item 1135 at 21 n.14. Perhaps, drawing all inferences in the government's favor, the jury could infer that Lavon and Orlando were discussing a cocaine deal. But even if that was the case, there was no evidence from which the jury could reasonably infer more than "a verbal agreement," *see Delvecchio*, 816 F.2d at 862, and the FaceTime calls therefore were nothing more than preparatory acts.[10]

---

[10] The government relies on *U.S. v. Abdallah*, 528 F. App'x 79 (2d Cir. 2013) (summary order), where the court found that a telephone call was a "substantial step" toward committing securities fraud. *See id*. at 82-83. More specifically, the court found that "given the specific content of the . . . call, as well as the pattern of conduct the government established at trial—[the defendant] would instruct [a coconspirator] regarding the target price of UPDV stock and how much to buy, and then [the coconspirator] would enter the order"—the call "was clearly more than a preparatory act." *Id*. at 82. The court distinguished that case from *Delvecchio* because unlike the drug dealers in *Delvecchio*, the defendant in *Abdullah* had called a coconspirator "with whom he . . . *had already formulated and executed an ongoing scheme* to defraud a number of victims over a period of months[] and instruct[ed] him to *put the previously agreed scheme into operation again* with a new victim." *Id*. at 83 (emphasis added). This, the court found, constituted "an overt act that was, in the context of his prior dealings with [the coconspirator], adapted to, approximated, and in the ordinary and likely course of things would result in, the commission of the particular crime." *Id*. (alterations and internal quotation marks omitted). That is an entirely different set of facts than those here.

So the question becomes whether Lavon's purchase of a plane ticket crossed the threshold from preparatory act to substantial step. And on that point, the Second Circuit has "held that venue did not lie in a case in which the defendant merely boarded an airplane flight in the relevant jurisdiction, en route to a meeting at which he committed the offense." *United States v. Purcell*, 967 F.3d 159, 189-90 (2d Cir. 2020) (citing *United States v. Tzolov*, 642 F.3d 314, 319 (2d Cir. 2011)). The court explained that "[a]t most, catching flights from the Eastern District to meetings where [the defendant] made fraudulent statements were preparatory acts. They were not acts 'constituting' the violation." *Tzolov*, 642 F.3d 314, 319.

In fact, the Second Circuit has explicitly "cautioned that 'venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense.'" *Id.* (quoting *United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181, 1190 (2d Cir. 1989)). Along the same lines, the court held in *Purcell* that "any passage by [the defendant] through the Southern District of New York on his way to Charlotte was merely a 'preparatory act[ ]' for the offense conduct and does not by itself establish a basis for venue." 967 F.3d 159 at 189-90 (explaining that defendant "attempted to recruit [victim] by *meeting* with her, not by *traveling to* his meeting with her"); *see also United States v. Ramirez,* 420 F.3d 134, 141-42 (2d Cir. 2005) (finding that venue did not lie in Southern District of New York for mail fraud when idea for the scheme to defraud originated in the Southern District but mailing occurred in another district).

Based on this caselaw, the Court finds that any conversations between Orlando and Lavon—even if they involved an agreement to purchase drugs—and Lavon's

purchase of the plane ticket were mere preparatory acts. It was not until Lavon got to Puerto Rico that he actually obtained the cocaine—undisputedly a substantial step toward possessing it in this District. And although there was evidence that Lavon shipped the package to Buffalo, this Court precluded any evidence that the intended recipient was Lavon or someone else in his conspiracy. *See* Docket Item 872 at 21-23. So there was no evidence linking Lavon's mailing of the package from Puerto Rico to *his possession* of the cocaine in the Western District of New York. *Cf. United States v. Pariseau*, 685 F.3d 1129, 1130 (9th Cir. 2012) (finding venue proper in Alaska on attempted possession with intent to distribute charge for defendant who "was on his way back to Alaska with two pounds of methamphetamine strapped to his legs when he was arrested" and had previously conducted "similar trips to bring methamphetamine back to Alaska").

For all those reasons, this Court finds that the government's evidence was insufficient to establish venue in this District as to count 2. The Court therefore grants Lavon's motion for a judgment of acquittal on that count.

### C.    Count 3 (Possession of a Firearm in Furtherance of a Drug Trafficking Crime)

Count 3 charged Lavon with possessing a firearm in furtherance of a drug trafficking crime. To prove this charge, the government is required to show that the defendant used or carried a firearm during and in relation to a drug trafficking crime or that he possessed a firearm in furtherance of a drug trafficking crime. *See* 18 U.S.C. § 924(c)(1)(A); *United States v. Lewter*, 402 F.3d 319, 321-22 (2d Cir. 2005).

As with count 1, there was ample evidence that Lavon possessed a firearm in furtherance of his drug trafficking crimes. In particular, as explained above, Putman

testified that he sometimes gave Lavon firearms in exchange for drugs. Docket Item 1061 at 40. Putnam also recounted a time when Putman lent Lavon an AK-47 to deal with "problems with somebody." Docket Item 1034 at 8-10. And Michelle Edwards testified that she saw a gun in Lavon's car after they drove around and Lavon asked Timothy Harris to identify "drug houses." Docket Item 1020 at 17-18; Docket Item 1073 at 9. Crediting those witnesses and drawing all inferences in the government's favor, the evidence was more than sufficient to prove count 3.[11]

### D.    Counts 4 (Discharge of a Firearm in Furtherance of a Drug Trafficking Crime) and 5 (Discharge of a Firearm Causing Death)

The jury convicted both defendants of discharging a firearm in furtherance of a drug trafficking crime and discharging a firearm causing the death of Kevin Turner, a rival drug dealer. *See* Docket Item 1057. Both defendants argue that there was insufficient evidence that Lavon killed Turner and that James aided and abetted Lavon. This Court disagrees. There was ample circumstantial evidence from which a jury could infer beyond a reasonable doubt that Lavon killed Turner and that James assisted Lavon.

For example, and perhaps most significantly, witnesses Timothy Harris and Michelle Edwards testified extensively about their interactions with Lavon and James on the day Turner was shot and killed. Harris and Edwards lived at 1810 Niagara Street at that time*, see* Docket Item 1020 at 2-3; Docket Item 1073 at 2-3, and Harris had

---

[11] Lavon also argues that count 3 is multiplicitous of counts 4 and 5 because it is based on the same predicate crime (the narcotics conspiracy charged in count 1) and because the jury could have convicted Lavon on count 3 based on his possession of the gun he used for Turner's murder. *See* Docket Item 1135 at 81-83; Docket Item 1173 at 54 n.22. That argument is addressed below. *See infra* Section III.A.

purchased both cocaine and heroin from Lavon, whom they knew as "White Truck," Docket Item 1020 at 5-8; Docket Item 1073 at 4-7.  On the morning of January 21, 2018, the day of the shooting, Lavon and James came to the residence where Harris and Edwards lived together.  *See* Docket Item 1020 at 9-10.  Lavon asked whether Harris knew "a guy named Buffalo."  Docket Item 1073 at 9.  Harris later learned that "Buffalo" was one of Turner's nicknames.  *See id.* at 19-20, 66.

At Lavon's request, Harris and Edwards then took a ride in a truck with Lavon and James, who was driving.  *See* Docket Item 1020 at 12-13.  While they were driving around, Lavon asked Harris whether he knew of any "drug houses," and Harris and Edwards said that they did not; when they wanted drugs, they said, people brought the drugs to them.  Docket Item 1020 at 16; Docket Item 1073 at 9.  After a few minutes, they stopped back at Harris and Edwards's house.  *See id.* at 9-11.  Edwards asked Lavon for $20 to buy pizza, but she really wanted the money for drugs.  Docket Item 1020 at 16-17; Docket Item 1073 at 12.  Lavon gave her the $20.  Docket Item 1020 at 17; Docket Item 1073 at 12.  As she exited the truck, Edwards saw a gun in the front seat and told Harris what she saw.  Docket Item 1020 at 17-18; Docket Item 1073 at 12-13.  Lavon then told Edwards "to give him a call" when they "purchased some drugs." Docket Item 1020 at 19.

When they got back to their house, Edwards and Harris texted Turner to bring them $20 of crack cocaine.  Docket Item 1073 at 13-14; Docket Item 1020 at 19-21.  At Edwards's direction, Harris then did what Lavon had instructed: he texted Lavon to "[c]ome now."  Docket Item 1073 at 15; *see* Docket Item 1020 at 19-20.  Turner soon delivered the crack cocaine to Harris and Edwards, and almost immediately after Turner

left, Harris and Edwards heard four shots. Docket Item 1073 at 16; Docket Item 1020 at 22-23. When they looked out their window, they saw that Turner had been shot on their porch. Docket Item 1073 at 16; Docket Item 1020 at 22-23.

Text messages and video surveillance corroborate Harris's and Edwards's account. For example, video surveillance shows Harris and Edwards being dropped off in front of 1810 Niagara Street in what Detective Troy Earp testified was James's pickup truck approximately 30 minutes before the shooting. *See* Docket Item 1026 at 104-18, 120. Moreover, Lavon can briefly be seen stepping out of the front passenger seat of the truck during the drop off. *See id.* at 113. And after the drop off, the truck can be seen making several more circles around the block. *See id.* at 116-17.

At 4:19 p.m., a text message from Harris's phone to Turner's phone says "come C me." Docket Item 1026 at 114-15; *see also* Docket Item 1073 at 15 (Harris's testifying that it was his phone but that Edwards also used it). Turner responded "Wassup," and Harris replied "20." *See* Docket Item 1026 at 115. At about the same time, Turner confirmed the transaction by texting "OK." *Id.* at 116. Then, about five minutes later, Turner is seen on a video crossing Niagara Street south to north toward 1810 Niagara Street. *See id.* at 9-10, 120. And at approximately 4:29 p.m., there is a text message from Harris's phone to Lavon's phone saying "come now" in all caps. *Id.* at 124.

1810 Niagara Street is located on the corner of an alley, between 18th Street and 19th Street. *Id.* at 9-10. There is a cut-through walkway between the alley and 18th Street. *Id.* A video recording shows that at about 4:33 p.m., a Jeep Liberty that Earp testified was registered to Tanesha Williams, Lavon Parks's then-girlfriend, turns the

corner from Niagara Street onto 18th Street where it parks at the opening of the cut-through walkway. *See id.* at 123-25, 131-32. The driver of the Jeep is shown getting out of the car and proceeding into the cut-through. *Id.* at 131-32. The front-seat passenger is then shown getting out of the Jeep Liberty, moving into the driver's seat, and driving circles around the block. *Id.* at 132, 135-39.

At approximately 4:35 p.m., a video recording shows a bystander ducking for cover, apparently reacting to shots fired. *See id.* at 134. And at that same time, six shots can be heard on a Nest Cam from 434 18th Street. *See id.* at 138. Eventually, someone is seen running out of the cut-through away from the murder scene across 18th Street in a northwest direction. *See id.* at 134-35.

Data from Lavon's cell phone shows that the phone was in the vicinity of 1810 Niagara Street around the time of the murder. *See* Gov. Ex. 95; *see also* Docket Item 1077 at 17-18. What is more, Lavon never used that phone again after the day of the homicide. *See* Docket Item 1026 at 45-47; *see also* Docket Item 1077 at 18 (government's closing argument) ("[W]hy stop using that phone the day of the killing? That should tell you a lot."). And, if all that were not enough, Diggs and Dezeray Wilson both testified that Lavon confessed to killing Turner—testimony that this Court must credit on a Rule 29 motion.[12] *See* Docket Item 1010 at 117-18; Docket Item 1070 at 37-38.

---

[12] The defendants argue that these witnesses should not be credited. *See, e.g.*, Docket Item 1135 at 7-9, 58-74. But that decision falls squarely within the jury's purview: "It is not for the court on a Rule 29 motion to make credibility determinations." *Autuori*, 212 F.3d at 118 (finding that notwithstanding "serious contradictions and conflicts in the government's evidence," trial court erred "[i]n discounting [witness's] testimony" and "impermissibly weighing evidence" on Rule 29 motion). This Court

Based on all that, this Court finds there was sufficient evidence to sustain the defendants' convictions on counts 4 and 5.

\* \* \*

For all those reasons, this Court grants Lavon's Rule 29 motion as to count 2 and otherwise denies it, and this Court denies James's Rule 29 motion.

## II.    RULE 33 MOTION FOR A NEW TRIAL

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "A district court should grant a new trial motion if it 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988)).  "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict."  *Id.*  And when considering a motion for a new trial, a district judge "is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner."  *Id.* (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978)); *see also United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992) (stating that a court also may make determinations as to witness credibility).  But while courts have greater discretion under Rule 33 than under Rule 29, they still must exercise their authority "sparingly" and grant a Rule 33 motion only in "the most extraordinary circumstances"; in other words, there must be a real concern that an

_____

cannot substitute its own judgment on Diggs's and Wilson's credibility for that of the jury.

innocent person may have been convicted before a court should intervene.  *Sanchez*, 969 F.2d at 1414.

The Court has no such concern here.  Nor do any of the specific arguments the defendants raise warrant a new trial.[13]

## A.    *Brady*

The defendants argue that the Court should vacate their convictions on count 1, as well as Lavon's conviction on count 3, because of *Brady* violations.  More specifically, they say that the government failed to turn over: (1) cell phone evidence from William Putman's and Milton Williams's phones and (2) reports regarding investigative efforts to use Putman to set up Lavon.  *See* Docket Item 1135 at 83-89.

The government's failure to turn over *Brady* material violates a defendant's rights under the Due Process Clause of the Fifth Amendment.  *See United States v. Hunter*, 32 F.4th 22, 30 (2d Cir. 2022).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory[] or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued."  *Id.* at 30-31 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  In such a case, "the district court may grant a new trial."  *Id.* at 30.

---

[13] As noted above, *see supra* note 4, Lavon framed all his arguments as Rule 29 arguments, or, in the alternative, Rule 33 arguments.  *See* Docket Item 1135 at 7 (Lavon's arguing that "[i]f the Court denies [his] motion for a judgment for acquittal [under] Rule 29, he alternatively advances the same arguments in support of a motion for a new trial [under] . . . Rule 33").  Because "[a] Rule 29 motion for acquittal may be granted only on the ground that the evidence against a defendant is insufficient," *Jabali*, 105 F. App'x at 313, the Court considers Lavon's remaining arguments in support of his motion for a new trial under Rule 33.

For the reasons that follow, the Court finds that the defendants have not established a *Brady* violation with respect to either the cell phone evidence or the Putman reports.  Thus, their motions for a new trial based on *Brady* are denied.

### 1.    Putman's and Williams's  Phones

As noted above, the Court ordered supplemental briefing regarding Putman's and Williams's phones to ensure that the government had turned over everything it had. After reviewing that briefing, the Court finds no *Brady* violation.

On December 17, 2017, the Niagara County Drug Task Force and Niagara Falls Police Department seized three cell phones from Williams's home under a state search warrant.  *See* Docket Item 1212 at 11.  About a month later, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") "took custody of these phones," and "the government obtained federal search warrants for [them]."  *See id.*  ATF then reported to the United States Attorney's Office that Williams's phones "were dumped" because "[n]othing was on one of the phones, [two] phone numbers were on the second phone with nothing else," and ATF had been unable "to get anything" from the third phone. *See id.*  In February 2018, ATF seized three other phones from Williams.  *See id.* According to the government, all "six phones acquired from Williams by law enforcement are still in ATF custody," but ATF has not been "able to generate any extraction reports from any of [them]."  *See id.* at 11-12.

Based on the government's representation that ATF was unable to generate extraction reports from Williams's six phones—the veracity of which this Court has no reason to doubt—the Court finds that the government has never possessed exculpatory information related to Williams's phones and that there was no *Brady* violation.

The same is true of any phones connected to Putman. The government states that ATF undertook "a comprehensive search," as did "local law enforcement partners involved in the investigation," all of whom "determined the government is not in possession of [any of Putman's] phones." *See id.* at 15-16. "Accordingly," the government says, it "cannot disclose that which it does not possess." *Id.* at 16. Of course, that is correct. And the defendants have given this Court no reason to doubt the government's representations that it does not have—and never had—possession of or access to information on Putman's phones.

What is more, the defendants' suggestion that there may be exculpatory information on Putman's and Williams's phones is wholly speculative. *See United States v. Rahim*, 339 F. App'x 19, 24 (2d Cir. 2009) (summary order) (rejecting *Brady* claim when exculpatory nature of the evidence was "speculative"). Therefore, the government did not violate *Brady* with respect to Putman's and Williams's cell phones.

### 2.    Putman Reports

The defendants claim that they were "prejudiced by the failure of the government to disclose reports showing investigative efforts to use William Putman to set up Lavon." Docket Item 1135 at 85. But ATF Agent Jason Bernhard testified that he did not have any reports regarding ATF's using Putman to attempt a controlled buy from Lavon. *See* Docket Item 1171 at 25. Rather, the basis of the defendants' claim seems to be an inconsistency between Putman's and Bernhard's trial testimony. *See* Docket Item 1135 at 88 ("According to Putman, he told police about Lavon Parks. Yet the ATF agent could not recall any investigative steps they took in relation to Lavon Parks including whether they attempted a controlled call or a controlled buy from him."). As best the

Court can tell, the argument is that if what Putman said at trial was true, there should have been a report about it. *See id.* ("The government urged the jury to credit Putman's testimony. If the Court credits Putman's testimony about trying to set up Lavon Parks, then the defense should have been provided with that information before trial."). "At the very least," the defendants say, they are "entitled to a factfinding hearing and production of the ATF's file." *Id.* at 89.

As noted above, to constitute a *Brady* violation, evidence must have been suppressed. There is no indication that the government has or had possession of any reports regarding Putman that it did not disclose. Rather, according to Bernhard's testimony, there are no such reports. To the extent that the lack of such reports reflects on Putman's or Bernhard's credibility, that is an argument for the jury; indeed, it is an argument that the defense made. *See* Docket Item 1084 at 53 (Lavon's closing) ("ATF Agent Bernhard said, yeah, I don't really know, I'm not sure that we ever even tried to make a controlled call to Lavon Parks or tried do a controlled buy. Putman said yeah, they wired me up [and] had me try to make a recorded call. I don't know what the reality is.").

What is more, even if the defendants could demonstrate the existence of a report about an attempt to use Putman to set up Lavon, they cannot establish that the failure to disclose that report prejudiced them. Putman admitted at trial that he was unable to set up Lavon despite trying to do so:

Q. Have you -- did they ever ask you to try to buy drugs from Lavon Parks?

A. Yes.

Q. And you weren't able to do that, right?

A. Correct.

31

Q. So even though you had told them that you had been getting all these drugs from Lavon Parks in 2017, you were not able to set him up the way you set up [Ariel] Rivera, correct?

A. Correct.

Docket Item 1034 at 64.  As a result of that testimony, the defense argued in closing that "Lavon never dealt with Putman, that there was no relationship with Putman, and that's why Putman couldn't set Lavon Parks up after Putman got arrested."  *See* Docket Item 1084 at 53.

There is no indication—other than mere speculation—that any report about Putman's attempt to set up Lavon would have changed the outcome of the trial.  As a result, the defendants cannot establish prejudice with respect to their *Brady* claim concerning the Putman reports.  *See United States v. Nash*, 338 F. App'x. 96, 99 (2d Cir. 2009) (summary order) (explaining vacating a conviction requires "a reasonable probability that the outcome would have been different but for the suppression of *Brady* material").

### B.    Lack of Immunity for Milton Williams

The defendants argue that the government violated their right to due process by declining to give Milton Williams immunity, resulting in Williams's invoking his Fifth Amendment right rather than testifying in support of the defendants.  *See* Docket Item 1135 at 22-35.  But the circumstances in which a court can compel the executive branch to grant immunity to a witness are "few and exceptional."  *See United States v. Praetorius*, 622 F.2d 1054, 1064 (2d Cir. 1979).  More specifically, "the defendant must show that the government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through overreaching, or has

deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation." *United States v. Ebbers*, 458 F.3d 110, 119 (2d Cir. 2006) (citations and internal quotation marks omitted).

The Court finds that the high bar for interfering with the executive branch's decision to grant immunity has not been met here. As the government notes, it "granted immunity to no trial witness, much less used immunity in a discriminatory way." *See* Docket Item 1171 at 11. And although "[t]he government did enter into cooperation agreements with certain trial witnesses . . . , Milton Williams refused to even meet with members of the prosecution team." *Id.*

According to the government, it opted not to call Williams upon learning that he would invoke his Fifth Amendment right. *See id.* But as far as it knows, the government says, Williams's testimony would have helped the government, not the defense. *See id.* And this Court has no reason to doubt that representation or the government's sincerity in making it. So the idea that Williams's testimony would have helped the defense—let alone changed the result of the trial—is speculation at best.

In sum, the defendants have not met the very high bar required for this Court's intervention into the executive branch's decision-making in granting immunity. Their motion with respect to Milton Williams therefore is denied.

### C.    The Government's Rebuttal Summation

The defendants did not object during the government's rebuttal summation, but they now argue that some of the prosecutor's remarks warrant a new trial. Among other things, the defendants take issue with the prosecutor's telling the jurors that he was talking to them not as a lawyer but as just "Joel," with his touting his own experience by

saying he has been doing this for many years, and with what they say were improper

attacks on defense counsel.  *See* Docket Item 1135 at 89-117.

A defendant who asserts that a prosecutor's remarks warrant reversal "face[s] a

heavy burden."  *See United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993).  The

defendant "must show not simply that a particular summation comment was improper,

but that the comment, viewed against the entire argument to the jury, and in the context

of the entire trial, was so severe and significant as to have substantially prejudiced him,

such that the resulting conviction was a denial of due process."  *United States v.

Wynder*, 147 F.4th 200, 216 (2d Cir. 2025) (citation and internal quotation marks

omitted).  And when the defendant has failed to object at trial, that task is even more

daunting.  *See United States v. Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000) (no

"revers[al] absent 'flagrant abuse'" for comments made during government's summation

where defendants did not object at trial (quoting *United States v. Rivera*, 22 F.3d 430,

437 (2d Cir. 1994))).

The defendants' arguments regarding the government's rebuttal summation do

not clear that high bar.  In fact, the prosecutor's remarks were appropriate responses to

the defense closings.  For example, the prosecutor's remark that he was talking to the

jurors as just "Joel" rather than as an attorney was a proper response to the defense's

characterization of the government's arguments as "condescending" and without

"common sense."  *See* Docket Item 1079 at 2; Docket Item 1084 at 2.  Likewise, his

comment that cooperating witnesses' "attorneys aren't going to let them lie to the

government and subject themselves to perjury" was a proper response to the repeated

arguments by the defense that the jurors should disregard the testimony of cooperating

witnesses who by virtue of their cooperation have a motive to lie. *See* Docket Item
1079 at 34-35.

The prosecutor's comment that he had "been doing this for so many years" was
not in the context of vouching for any evidence in the case; it was in the context of
remarking about the diversity of experience of the jury:

> You heard the facts, I'm not gonna go through that again. You have your
> own experiences. But I want to impress upon you the instructions the judge
> is gonna give, because as we talked to each of you during jury selection,
> we found out a lot about it. To be honest, it's pretty impressive, it's kind of
> cool. I've been doing this for so many years, I'm thinking, wow, we have
> roofers, we have teachers, we have nurses, we have people in IT, and I'm
> listening to your experiences, that's pretty cool.

Docket Item 1079 at 5-6. Similarly, read in context, the analogies he gave about
roofers, teachers, and nurses knowing the rules of their professions when outsiders
might not was merely an attempt to ensure that the jurors follow the rules as the Court
gives them rather than accept the defense's version of the facts and what the
government viewed as a mischaracterization of the law:

> And I think to myself now as we hear this proof, and I hear that we're being
> condescending to you, and I see what the defense is asking you to consider,
> I think, oh, my goodness, what if these jurors don't follow the rules that the
> judge gives them and they start buying into some of this misleading
> information that the defense is giving them? The mischaracterization of the
> law and the instructions that they're asking you to consider.
>
> That would be like if you're a roofer, and somebody comes in without
> knowing anything. . . . Or if you're a teacher, and someone comes in and
> says I know the job[.] . . . You're a nurse, you're working in the emergency
> room where you['re] working with a patient, and somebody's gonna come
> in and say, well, no, I watched . . . Gr[e]y's Anatomy. I know what that
> person has. . . .
>
> Are you going to let them do that to you? You've got to be able to take care
> of the job at the end: The patients, the roof, the students?
>
> Well, this is our job. We have those same concerns.

You may watch TV and think you know how you do it, but that's not how you do it.

*See id.* at 6-7.

In sum, there was nothing improper in the prosecutor's rebuttal, let alone anything rising to the level of "flagrant abuse." *See Zichettello*, 208 F.3d at 103. Thus, the defendants are not entitled to a new trial based on the government's rebuttal summation.

### D.    Severance

James argues in passing that his case should have been severed from Lavon's. *See* Docket Item 1134 at 56-57. But James already raised—and this Court already denied—that request. *See* Docket Item 674; Docket Item 678 at 61-63. The Court sees no reason to revisit its earlier decision and finds that the defendants were properly tried together.

### E.    Michelle Edwards's In-Court Identification of James Parks

James notes that he "strenuously objected" to Edwards's in-court identification of him because "there was no prior indication" that she would be able to do so. Docket Item 1134 at 60. More specifically, James's counsel explained at trial that "the 3500 material . . . indicate[d] that [Edwards] was shown a photo array, that James Parks was one of the individuals in the photo array, and that she was not able to identify him." Docket Item 1020 at 23-24. Instead, "[s]he identified a different person in that photo array." *Id.* at 24. Thus, according to the defense, the government should not have been allowed to ask Edwards whether she recognized the driver of the car in court. *See id.* at 25-27.

The government disagreed and advised the Court that it did not know whether Edwards would be able to identify James.  *See id.* at 26.  The prosecutor told the Court that he had previously shown Edwards a photo of James and asked, "do you know who this is?"  *Id.* at 34.  But he had done nothing more, nor had he suggested anything about the photograph.  *See id.*

Ultimately, the Court allowed the government to ask Edwards whether she could identify the driver of the truck and, if so, to do so:

> Q. Okay. So, if I was to ask you to identify that person today, based upon the short time that you saw him, would you be able to do that?
>
> A. Yes.
>
> Q. Okay. And could . . . you [do] that for the record, please?
>
> A. He's in the back.
>
> . . .
>
> Q. And just for clarification, is that the individual who was driving the truck?
>
> A. Yes.

*Id.* at 78-79.

The Court sees no reason to revisit this ruling.  There is no indication that the prosecution did anything wrong or improperly suggested that Edwards should identify James when it showed her the photograph or in court.  And James had the opportunity to—and did—cross-examine Edwards on the fact that she had not been able to identify James prior to trial.  *See* Docket Item 1020 at 92-104.  Indeed, James's counsel asked Edwards directly whether she recognized James in court simply "because [she was] shown photos of him by the prosecution team," and she responded unequivocally: "No." *Id.* at 103.

Thus, this Court finds no error in its allowing Edwards to identify James at trial.

## F.     Improper Evidence of Countersurveillance

James argues that the government improperly elicited a lay opinion that he conducted "countersurveillance" prior to Turner's murder. *See* Docket Item 1134 at 64-65. More specifically, Troy Earp—a detective lieutenant with the Niagara Falls Police Department—made the following unsolicited statement when testifying about a video of James Parks pulling up to a gas station near the site of Turner's murder: "This is important for me because this is reconnaissance, this is something I did in the military." *See* Docket Item 1026 at 2, 91. James's counsel objected, the Court sustained the objection, and the Court told the witness, "Please don't volunteer. Answer the lawyer's questions, and don't volunteer." *Id.* The Court then told Earp that he could testify about what he saw James "do and what [Earp's] next step [wa]s based on that," but no more. *Id.* at 92. And the Court sustained other objections to questions that might have elicited Earp's opinion that James was conducting countersurveillance. *See id.* at 93-94.

James now argues that he is entitled to a new trial because "Earp should have never testified that what [James] was doing was countersurveillance or that he kn[ew that] because he did the same thing in the military." *See* Docket Item 1134 at 64-65. But in contrast to the case law on which James relies, this Court *sustained* James's objection to the challenged testimony. *Cf. United States v. Cabrera*, 13 F.4th 140, 145 (2d Cir. 2021) (granting new trial where agent was allowed to testify "[o]ver [defendant]'s objection . . . that [defendant], unlike the 'average drug dealer,' appeared to be 'experienced' because he had employed countersurveillance driving techniques (which

consisted of really bad driving)").  And there is no indication that the jury considered Earp's statement despite the Court's sustaining the objection.

Moreover, even assuming that Earp's testimony resulted in error, that error was harmless.  *See United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009) (factors for determining harmless error are: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted [evidence]; and (4) whether such evidence was cumulative of other properly admitted evidence" (citation omitted)).  Here, the prosecution's case was quite strong, Earp's testimony was unsolicited and not any fault of the government's, the countersurveillance point was minor in the grand scheme of all the evidence, and there was ample other evidence regarding the shooting.  *See supra* Section I.D (describing government's evidence on counts 4 and 5).  Thus, this Court is hard pressed to see how James could demonstrate that the result would have been different absent this testimony, and he is not entitled to a new trial on that basis.

### G.    The Supreme Court's Decision in *Glossip v. Oklahoma*

On February 25, 2025, the United States Supreme Court decided *Glossip v. Oklahoma*, 604 U.S. 226 (2025).  The petitioner in that case, Richard Glossip, had been convicted of—and sentenced to death for—"paying Justin Sneed to murder Barry Van Treese."  *Id.* at 231.  At Glossip's "trial, Sneed admitted he beat Van Treese to death[] but testified that Glossip had offered him thousands of dollars to do so."  *Id.*  "Glossip confessed he helped Sneed conceal his crime after the fact, but he denied any involvement in the murder."  *Id.*

Then,

> [n]early two decades later, the State disclosed eight boxes of previously withheld documents from Glossip's trial. These documents show[ed] that Sneed suffered from bipolar disorder, which, combined with his known drug use, could have caused impulsive outbursts of violence. They also established, the State agree[d], that a jail psychiatrist prescribed Sneed lithium to treat that condition, and that the prosecution allowed Sneed falsely to testify at trial that he had never seen a psychiatrist. Faced with that evidence, Oklahoma's attorney general confessed error.

*Id.* The State took the extraordinary step of asking the Oklahoma Court of Criminal Appeals ("OCCA") to vacate Glossip's conviction and grant him a new trial, but the OCCA denied that request. *Id.* The Supreme Court reversed, however, finding that "the prosecution's failure to correct Sneed's trial testimony violated the Due Process Clause" and that Glossip therefore was "entitled to a new trial." *Id.* at 252; *see also Napue v. Illinois*, 360 U.S. 264, 272 (1959) (finding due process violation and reversing conviction when "false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial").

The defendants argue that "[l]ike *Glossip*, the only direct witness regarding Lavon Parks's alleged involvement in Kevin Turner's death . . . was Alphonso Diggs." Docket Item 1179 at 3. And, they argue, "the government knew . . . that Diggs lied at trial about his [mental health] diagnosis and treatment" but failed to correct that testimony. *Id.* at 3. They therefore "ask[] that the Court consider the holding in *Glossip* in conjunction with the pending post-trial motions." *Id.* at 9.

*Glossip* is inapposite for several reasons. First, in *Glossip*, the State failed to "disclose[] eight boxes of . . . documents," which contained evidence undermining Sneed's credibility. *See* 604 U.S. at 231. Here, by contrast, *the defendants* obtained

the documents at issue through a Rule 17 subpoena and were able to cross-examine Diggs on them.  *See* Docket Item 1179 at 3; Docket Item 1187 at 5.

Second, in *Glossip*, the State *admitted* error and was itself seeking a new trial. *See* 604 U.S. at 246 (explaining that "Oklahoma's attorney general . . . conced[ed] both that Sneed's testimony was false and that the prosecution knowingly failed to correct it").  Here, by contrast, the government denies that Diggs's testimony about his mental health was false.  Unlike Sneed, the government says, Diggs did not actually deny he had been diagnosed with schizophrenia; instead, he stated on cross-examination that he did not recall:

> Q. Let me ask you more recently.  Do you recall in September of 2019 seeing a counselor at Northpointe Council who notes that you have a significant history of schizophrenia?
>
> A. At Northpointe Council?
>
> Q. *If you don't remember, you don't remember*.
>
> A. *I don't remember* . . . .
>
> . . .
>
> Q. So as you're sitting here today, *do you recall* being told by a doctor that you suffered from schizophrenia?
>
> . . .
>
> A. No.
>
> Q. No?  *You don't recall* anybody ever telling you that you suffered from schizophrenia?
>
> A. You said again -- *I don't recall* any -- anybody.  Are you narrowing, excuse me, I took my meds, or -- okay.  When I went to Memorial, the 6th floor mandated from parole, because I was gone for 15 years, *I don't recall* anybody there telling me that at all.
>
> Q. *Do you recall* anyone there telling you that you suffered from schizoaffective disorder bipolar type?

A. From the Memorial Hospital?

Q. Yes.

A. No.

Docket Item 1016 at 33-35 (emphasis added); *see* Docket Item 1187 at 6-7.  So unlike Sneed's testimony in *Glossip*, there is a factual question as to whether Diggs's testimony was false.

What is more, and in contrast to *Glossip*, the cross-examination here made clear that Diggs had taken a medicine called Seroquel, which counsel suggested is used to treat schizophrenia:

Q. Do you remember them putting you on medication called Seroquel for your schizophrenia?

A. I told them I couldn't sleep, and that's *when he prescribed Seroquel*, but I thought it was for sleep.  It helped me sleep.

*Id.* at 35 (emphasis added).

Finally, Diggs's testimony was not the only evidence that Lavon was responsible for Turner's murder.  As outlined above, *see supra* Section I.D, testimony from other witnesses, video surveillance, and Lavon's text messages all supported the jury's verdict.  In *Glossip*, by contrast, "[b]esides Sneed, *no other witness and no physical evidence* established that Glossip orchestrated Van Treese's murder.  Thus, the jury could convict Glossip *only if* it believed Sneed."  604 U.S. at 248 (emphasis added).

For all those reasons, this Court finds that *Glossip* does not entitle the defendants to a new trial.

III.    OTHER ARGUMENTS

A.    Multiplicity (Counts 3, 4, and 5)

The defendants also argue that their convictions on counts 4 and 5 (charging discharge of a firearm and discharge of a firearm resulting in death, respectively) and Lavon's conviction on count 3 (charging possession of a firearm in furtherance of a drug trafficking crime) are multiplicitous.[14]  *See* Docket Item 1135 at 81-83; *United States v. Finley*, 245 F.3d 199, 205 (2d Cir. 2001) (explaining that "[a]n indictment is multiplicitous" and therefore violates the Fifth Amendment's Double Jeopardy Clause "when it charges a single offense . . . multiple times, in separate counts, when, in law and fact, only one crime has been committed" (quoting *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999))).  The government concedes that—at least with respect to counts 4 and 5—this Court may impose only one sentence.  *See* Docket Item 1171 at 24 ("[F]or sentencing purposes, the government will elect to either proceed with the 924(j) conviction[] or the 924(c) conviction and the predicate.").[15]  The government says,

---

[14] This Court previously rejected the argument that counts 4 and 5 were multiplicitous, finding that count 5 includes an additional element: that the discharge of the firearm caused a death.  *See* Docket Item 720.  The Court denied the motion without prejudice to the defendants' renewing it after trial based on the proof.  *See id.*

[15] As Lavon observes in his reply, "[i]t is unclear if the government is referring to both 924(c) counts ([c]ounts 3 & 4) or just count 4" in its statement that this Court can only impose one sentence.  *See* Docket Item 1173 at 54 n.22.  The government concedes, however, that counts 3, 4, and 5 all have the same predicate offense—that is, count 1.  *See* Docket Item 1171 at 24 ("Here, [Lavon was] convicted of [c]ount 3, a section 924(c) charge, based on [his] involvement in the narcotics conspiracy outlined in [c]ount 1.  Similarly, the defendants were convicted of [c]ounts 4 and 5 based on the same predicate crime ([c]ount 1).").  And the Second Circuit has held that "the appropriate unit of prosecution under [section] 924(c)(1) is the predicate offense . . . rather than the number of firearms."  *United States v. Mejia*, 545 F.3d 179, 204-05 (2d Cir. 2008) (citing *United States v. Lindsay*, 985 F.2d 666, 674 (2d Cir. 1993)); *see also United States v. Goitom*, 867 F. Supp. 2d 290, 294 (D. Conn. 2012) ("If the two [section] 924(c) counts are based on a single 'unit of prosecution,' then they are multiplicitous

however, that the Second Circuit's decision in *United States v. Lindsay*, 985 F.2d 666 (2d Cir. 1993), instructs that this Court should not vacate one of the convictions but should instead combine them for sentencing.  Docket Item 1171 at 24.

The Court finds that this issue is more properly addressed at sentencing.  *See United States v. Mostafa*, 965 F. Supp. 2d 451, 464 (S.D.N.Y. 2013) (explaining that because "the Double Jeopardy clause . . . prohibits duplicative punishment" but "does not prohibit simultaneous prosecutions for the same offense . . . , multiplicity is properly addressed by the trial court at the sentencing stage").  Accordingly, the Court denies without prejudice the defendants' motions to vacate their convictions based on multiplicity and will address these issues at sentencing.

### B.    Sixth Amendment Right to a Speedy Trial

After a somewhat tortuous history that included voluminous pretrial motions and the dismissal of certain counts, *see* Docket Items 573 and 715, this case was scheduled for trial on October 21, 2022.  *See* Docket Item 726.  At oral argument nine days before trial, the Court ordered "the government to re-examine its file" for possible *Brady* material based on concerns raised by Lavon.  *See* Docket Item 872 at 11.  Two days later, "in an abundance of caution" the government submitted an ex parte request asking this Court to review documents in camera and to confirm the government's position that they did not constitute *Brady* material.  *See id.* at 11-12.

---

and improper.").  Thus, "[o]nly where the defendant commits multiple drug-trafficking crimes or violent crimes, and the government can link the firearms to those crimes, may the government prosecute for multiple violations of [section] 924(c)(1)."  *Lindsay*, 985 F.2d at 674 (internal citation omitted).  By contrast, "[w]here the government links multiple firearms to a single crime, only one [section] 924(c)(1) violation occurs."  *Id.* The government should be prepared to address this caselaw at sentencing.

The Court reviewed the materials the government submitted and, on the day that jury selection was scheduled to begin, it met with the government ex parte and expressed concerns that certain materials should have been disclosed. *See id.* at 12-14. The Court indicated to the government that it was "inclined to order that all the investigative reports be turned over to the defense" but "agreed to give the government some time to further research the issue," resulting in the adjournment of jury selection. *See id.* at 14. Later that same day, "the government admitted that it had been mistaken about at least one matter discussed with the Court earlier . . . and said that it intended to disclose the complete package of investigative reports to the defense," which it then did that afternoon. *See id.*

Two days later, the defendants moved to dismiss the third superseding indictment based on "violations of *Brady* and other government disclosure obligations." *See id.* at 15 (citing Docket Item 742). The defendants also filed a supplemental memorandum of law asking this Court to reconsider various evidentiary rulings. *See id.* (citing Docket Item 745). After reviewing "[e]xtensive filings on the motion to dismiss as well as on other discovery and evidentiary issues [filed] over the next several months," *see id.* (citing Docket Items 763, 769, 775, 788, 800, 816, 819, 821, 825, 832, 833, 838, and 841), and after hearing oral argument, this Court issued a decision denying the motion to dismiss but precluding the government from presenting certain evidence as a sanction for the disclosure violations, *see generally id.*

About a week later—on July 13, 2023—the defendants moved to dismiss the indictment on speedy trial grounds. Docket Item 881. The government responded, Docket Item 974, and the defendants replied, Docket Item 980. On November 16,

2023, this Court denied the defendants' motion, *see* Docket Item 994, and the case proceeded to trial on November 20, 2023. *See* Docket Item 1001. The defendants "now renew[ their] motion on constitutional speedy trial grounds." Docket Item 1135 at 118.

This Court has carefully reviewed the decision it delivered from the bench on this issue, *see* Docket Item 1005 at 2-15, and finds no error in that decision. Nor do the defendants' additional arguments based on trial testimony after this Court's prior decision tip the balance in their favor.

"[A] speedy trial is guaranteed the accused by the Sixth Amendment to the Constitution." *Barker v. Wingo*, 407 U.S. 514, 515 (1972). The relevant factors the Court considers in evaluating whether the defendant's constitutional right to a speedy trial has been violated are: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right in the run-up to the trial; and (4) whether the defendant was prejudiced by the failure to bring the case to trial more quickly. *Id.* at 530.

Here, the Court found that on the first *Barker* factor, the "length of the delay is more than four years [which] clearly favors the defense" and "makes this presumptively too long." Docket Item 1005 at 3. On the second factor, the Court noted that it had "parsed the docket"—especially after August of 2021 when Lavon wrote to the Court and requested a speedy trial—"to determine why this case has taken so long to get to trial." *Id.* at 4. The Court then reviewed in detail the long and winding road to trial[16] and

---

[16] The transcript of this Court's decision from the bench provides a detailed description of the progression of the case, *see* Docket Item 1005 at 4-13, and the Court will not repeat it here.

concluded that the delay largely was the result of "defense [counsel's] trial schedules[] and defense motions that inured to the defendant[s'] benefit." *See id.* at 4-13.

Regarding the third *Barker* factor, the Court noted that there was "no question that [Lavon] invoked [his right] . . . [in] August of 2021" when he wrote a letter to the Court. *See id.* at 14. In fact, the Court "set [a] trial date very promptly based on that invocation." *See id.* But then, through all the various delays and defense motions, there was "not another peep about it until November 3rd of 2022," after which all the speedy trial "exclusions the defense objected to were exclusions as a matter of law" due to the pending defense motions. *See id.*

Finally, the Court found that the final *Barker* factor was "neutral." *See id.* at 13. The Court first noted that "the time that Lavon . . . spent detained and the time that both defendants have spent with this indictment hanging over their heads [wa]s undoubtedly prejudicial." *Id.* "But," the Court continued, "the defendants chose, and I think wisely chose, to litigate a number of issues in this case that they felt would result in a more favorable trial posture for them." *Id.* at 14. And indeed, the defendants "won a lot of those motions. They won the motion to suppress the Tennessee stop. They won the motion to exclude [Rhonda Howard's] excited utterance, and . . . the Wayne Payne motion was something that [the Court] reconsidered on [its] own and granted to the defense." *Id.* "So by virtue of the motion practice the defense chose to engage in," the Court concluded, "they got a significant advantage." *Id.*

In sum, the Court found that

the length of the delay works to the defendants' advantage[] but that the reasons for the delay, the sporadic invocations of the right, and the invocations of . . . the right to a speedy trial, that were contrary to the Speedy Trial Act because of the defendants' motions pending, and the neutrality of

the prejudice to the defendants, . . . all le[d the Court] to deny the defendants' motion to dismiss for speedy trial rights.

*Id.* at 15.

The defendants now add the argument that they were "unfairly prejudiced by the admission of evidence at the trial in November 2023 which was not available to the government in October 2022 and, in addition, [they were] impaired due to witnesses' inability to recall material events."  Docket Item 1135 at 118.  More specifically, they argue (1) that they were "unfairly prejudiced when the government located a key witness," Alena Woolcot, "who would not have been called had the trial proceeded as scheduled in October 2022"; (2) that "[t]he delay led another key witness," Lindsey Groffenberg, "to materially change her grand jury testimony and interject inflammatory material that was harmful to the defense"; (3) that "[t]he [d]efense was significantly impaired by the deaths of witnesses Rhonda Howard and Daniel Wilson"; (4) that "[b]y the time of trial, the defense was prejudiced because several material witnesses," and in particular, Johnny Hilson, "could not be located"; and (5) that "[m]any of the government's witnesses could not remember important details favorable to the defense."  *See id.* at 120-31 (bold omitted).  For the reasons that follow, none of those new issues tip the balance on the prejudice analysis.

Regarding Woolcot, the *Baker* prejudice prong addresses impairment to the defense, not enhancement of the government's case.  *See United States v. Abad*, 514 F.3d 271, 275 (2d Cir. 2008) (rejecting defendant's argument that "the delay allowed the government to locate certain 'key prosecution witnesses'" because the fourth *Barker* factor "is concerned with impediments to the ability of the defense to make its own case (e.g., if defense witnesses are made unavailable due to the government's delay)" and

48

"the opportunity for the prosecution to prepare for trial does not, on its own, amount to prejudice to the defense" (italics omitted)).[17]  The defendants' argument that "new information from . . . Groffenberg likely would not have been available" in October 2022, *see* Docket Item 1135 at 124, fails for the same reason.

With respect to Howard and Wilson, both witnesses died *before* Lavon asserted his speedy trial right in August 2021.  *See* Docket Item 1171 at 49.  And what is more, this Court precluded certain evidence as to these witnesses because of the government's failure to timely disclose it.  *See generally* Docket Item 872.

The defendants say that they "could not locate . . . Hilson," who, they contend, would have given testimony suggesting that Diggs was responsible for Turner's murder. *See* Docket Item 1135 at 126.  But the defendants do not provide any reason why they would have been able to locate Hilson had the trial been held earlier.  Therefore, they have not established that the delay caused any prejudice in connection with Hilson.

Finally, with respect to the witnesses' memories, the defendants have not established that those memories would have been better in October 2022—or even 2021—given that many of the events occurred years before.  Nor have they "demonstrate[d] that any of the 'faded memories' were material or exculpatory to the defense."  *See* Docket Item 1171 at 52.

---

[17] Moreover, "the Court provided the defense with additional time to prepare for . . . Woolcot's testimony by prohibiting the government from calling her until the end of the trial," and "[t]he defense used this time to secure testimony from Qyrdie Ferguson, who directly addressed . . . Woolcot's testimony."  *See* Docket Item 1171 at 48.

For all those reasons, the defendants have not given the Court any reason to revisit its earlier weighing of the *Barker* factors, and the Court finds no violation of their right to a speedy trial.

### C.    Request for an Evidentiary Hearing

Finally, the defendants ask for an evidentiary hearing to explore what they claim was prosecutorial misconduct in failing to disclose certain evidence. More specifically, the defendants say that documents recently produced by "Niagara County demonstrate that a month before this case was scheduled to be tried," Diggs "was arrested for driving while impaired by drugs."[18] Docket Item 1210 at 1. And, the defendants say, "[a]t least one DEA task force officer knew about it." *Id.*

As explained above, there are three requirements to establish a *Brady* violation: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the [government], either willfully or inadvertently"; and (3) "prejudice must have ensued." *Hunter*, 32 F.4th at 30-31 (quoting *Strickler*, 527 U.S. at 281-82). The government focuses on the second and third prongs here, arguing both that the evidence was not suppressed and that, even if it had been, it would not have made a difference in the result of the trial. After careful consideration, the Court agrees.

First, the government says that it was not aware of Diggs's arrest and therefore did not suppress it. *See* Docket Item 1217 at 3 (arguing that "the government could not

---

[18] As noted above, the defendants moved for a post-trial subpoena under Rule 17 of the Federal Rules of Criminal Procedure, and the Court granted that request. *See* Docket Item 1204.

suppress evidence it had no possession of, as the matter was being prosecuted by another jurisdiction"). The government acknowledges, however, that following Diggs's arrest, DEA Task Force Officer Nathan Shumaker "called the Niagara County jail and requested a 'keep-away' order between Diggs and Lavon Parks who was housed at the same jail." *See id.* So at least Shumaker, a federal task force officer, knew that Diggs had been arrested.

*Brady* obligations extend to anyone "acting on the government's behalf." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Thus, "where a government agent is involved in the investigation or prosecution of the offense, his or her knowledge is to be imputed to the prosecution." *United States v. Sanchez*, 813 F. Supp. 241, 247 (S.D.N.Y. 1993), *aff'd*, 35 F.3d 673 (2d Cir. 1994). "[T]he propriety of imputing knowledge to the prosecution is determined by examining the specific circumstances of the person alleged to be an 'arm of the prosecutor.'" *Stewart*, 433 F.3d at 298. And that analysis hinges on "what the person *did*, not who the person *is*." *Id.* In other words, "[i]t does not turn on the *status* of the person with actual knowledge, such as a law enforcement officer, prosecutor[,] or other government official." *Id.*

For example, in *Stewart*, the Second Circuit affirmed the district court's finding that an expert witness who "analyzed a single document, explained the forensic ink tests that had been performed, discussed potential testimony by the defense ink expert, assisted prosecutors to develop cross-examination questions addressing certain technical aspects of ink testing, and participated in a mock examination on ink issues to prepare for trial" was not a member of the prosecution team for *Brady* purposes. *Id.* at

298-99. The expert's "role was limited to matters concerning his area of expertise—ink"—and "[h]is testimony at trial related only to his credentials, the tests that were performed[,] and the conclusions he drew from them." *Id.* at 298. Because there was no suggestion that the expert "was in any way involved with the investigation or presentation of the case to the grand jury," the Second Circuit found that he had "acted only in the capacity of an expert witness . . . and not as a fully functioning member of the prosecution team." *Id.* at 299 (internal quotation marks omitted).

By contrast, in *Sanchez*, the court found that officers who "were assigned to the New York Drug Enforcement Task Force, a joint city-state-federal task force that was responsible for investigating the narcotics conspiracy in which [the defendant] was involved" were "clearly part of the federal prosecution team." 813 F. Supp. at 248. The court explained that "[t]hey were deputized as federal agents[, ]at the time of the search and arrests at issue they were executing federal warrants," and one of them "actively assisted the prosecutors at . . . trial." *Id.*

Here, although the government did not ultimately call Shumaker at trial, he was on the government's witness list. Docket Item 1210 at 3. More specifically, the government advised that Shumaker may "testify about conducting surveillance of Lavon Parks in Niagara Falls, New York[,] on July 17, 2018," and "regarding the chain of custody and submission of drug exhibits to the DEA Northeast Laboratory including the drugs obtained during controlled purchases on August 8." *Id.* Additionally, "the government's 3500 exhibits for [task force officer] Shumaker show he was assigned to DEA [Resident Office] Group D58 which, along with the Niagara County Drug Task Force, conducted an investigation into Milton Williams." *See* Docket Item 1224 at 1 n.1.

The government does not dispute that Shumaker worked on the investigation in this case. Instead, it argues that Shumaker recently indicated to the prosecution team that "he was not aware of the facts or circumstances regarding the arrest, had no conversation with Diggs or the arresting officers, and gave no instructions or requests to Niagara Sheriff's Deputies beyond the 'keep-away' request." *See* Docket Item 1217 at 3.

At a minimum, it is clear that Shumaker knew that (1) Diggs had been arrested and (2) Diggs had some involvement with Parks such that a "keep-away" order was necessary. Whether Shumaker's knowledge of Diggs's arrest should be imputed to the prosecution, however, is a close question. On the one hand, Shumaker clearly had some involvement in the investigation; on the other, it does not seem to be extensive involvement, and the government never called him at trial. But ultimately, the Court need not decide this close issue because even assuming that Shumaker should have told the prosecution team about the arrest, the Court finds no *Brady* violation. More specifically, Lavon has not established that the information that was not disclosed—that Diggs had been arrested for driving under the influence—would have tipped the scales in Lavon's favor.

First, as the government observes, much of the defense's argument centers around the implication that the dismissal of Diggs's Lockport charges "was a benefit conferred to Diggs in return for his cooperation against the defendants." *See id.* at 5. But the prosecutors—as officers of the court—categorically say that "[i]t was not." *See id.* Indeed, they say they did not even know about the state case until the post-trial motion practice. *See id.* ("The government could not have conferred such a benefit

because, as noted, we were not aware of the case, nor did we have the authority to do so.").  Nor is there any indication in the record that the Niagara County District Attorney conferred some benefit on Diggs for his cooperation in an unrelated federal case.  On the contrary, the assistant district attorney who handled the matter told federal prosecutors that the case had been dismissed because "[t]he prosecution was unprepared to proceed to trial and lacked the necessary witnesses to meet its burden."  *See id.*  So as far as impeachment material, the only information at issue is the arrest itself.

Second, it is far from clear that this Court would have allowed cross-examination on an arrest that resulted in charges that were dismissed six months prior to the trial in this case.  Because the arrest did not result in a conviction, it would not be admissible under Federal Rule of Evidence 609—"Impeachment by Evidence of a Criminal Conviction."  Nor is it likely to be admissible under Rule 608, which provides that "the court may, on cross-examination, allow [specific instances of prior conduct] to be inquired into if *they are probative of the character for truthfulness or untruthfulness*."  Fed. R. Evid. 608(b) (emphasis added); *see Dougherty v. Cnty. of Suffolk*, 2018 WL 1902336, at *7 (E.D.N.Y. Apr. 20, 2018) (noting that "probative value" of "conviction for Driving While Intoxicated" was "not apparent" and did "not 'substantially outweigh' any potential prejudicial effect"); *cf. Nibbs v. Goulart*, 822 F. Supp. 2d 339, 344 (S.D.N.Y. 2011) (allowing "evidence of *inconsistent statements* made by [arrestee] in connection with two violations, one for driving while intoxicated and one for trespassing" (emphasis added)).  Moreover, even if the Court were to find that the arrest had some probative value for Diggs's truthfulness, it may well have precluded it under Federal Rule of

54

Evidence 403. *See United States v. Harris*, 551 F. App'x 699, 706 (4th Cir. 2014)

(explaining that "[m]ere accusations of prior misconduct inherently have little probative

value" and "naturally pose a risk of misleading the jury, given the danger that a jury will

infer more from the previous investigation than is fairly inferable" (alterations, citations,

and internal quotation marks omitted)).

Finally, even if this Court would have allowed such cross-examination, the

defendants have not shown that the result would have been different. Diggs's testimony

was corroborated by physical and testimonial evidence, including Dezeray Wilson's

testimony that she witnessed Lavon's confession to Diggs. *See* Docket Item 1070 at

37-38 ("Q. Okay. Did you hear Lavon Parks tell . . . Diggs that he had to kill the man?

A. He said he had to do it."). And given all the other evidence presented at trial

regarding the shooting, *see supra* Section I.D, evidence of an arrest in a case that was

later dismissed against Diggs would not have changed the result of the proceedings.

Thus, even if Diggs's arrest was *Brady* material that should have been disclosed,

the defendants cannot show prejudice as required to vacate their convictions on that

basis. As such, an evidentiary hearing would be futile.

## CONCLUSION

For all those reasons, Lavon's Rule 29 motion is GRANTED IN PART and

DENIED IN PART; more specifically, it is GRANTED as to count 2 but otherwise

DENIED. James's Rule 29 motion, as well as both defendants' Rule 33 motions, are

DENIED. The defendants' motion to vacate counts 3, 4, or 5 as multiplicitous is

DENIED WITHOUT PREJUDICE; the defendants' motion to vacate based on their Sixth

Amendment right to a speedy trial is DENIED; and the defendants' request for an

evidentiary hearing also is DENIED.  The defendants' sentencings will proceed as scheduled on January 7, 2026.  *See* Docket Items 1235 and 1236.

        SO ORDERED.

        Dated:   November 7, 2025
                 Buffalo, New York

                      */s/ Lawrence J. Vilardo*
                      LAWRENCE J. VILARDO
                      UNITED STATES DISTRICT JUDGE